CHARLES M. HOLT, Appellant, v. HANNIBAL & ST. JOE RAILROAD COMPANY, Respondent.

St. Louis Court of Appeals, February 12, 1901.

1. **Carriers of Passengers: PASSENGER, EJECTMENT OF FOR FAILURE TO PAY FARE.** Under the common law, carriers of passengers, for their own protection and for the convenience and comfort of the traveling public, were entitled to eject from their vehicles, without unnecessary force, any passengers who refused to pay the established fare for such transportation.

2. **———: ———: STATUTORY CONSTRUCTION.** Under the provisions of section 1074, Revised Statutes 1899, a passenger can only be put off the train for refusal to pay his fare for transportation when the train shall have been brought to a stop at one of its stations, or near a dwelling house.

3. **Passenger, Definition of.** A passenger is one who enters the vehicle of a carrier with the intention of paying in money the usual

Holt v. Han. & St. Joe Ry. Co.

fare for his transportation or who is supplied with a ticket or pass, entitling him to ride to a given point.

4. ———: REFUSAL TO PAY FARE: INSTRUCTIONS. In the case at bar, the following instruction properly declared the law and should have been given by the trial court: "Although the jury should find that plaintiff did at first refuse to pay his fare, yet if, when he saw the conductor was stopping the train to put him off, he then changed his mind and offered to pay and tendered to the conductor the money for his fare, it then became the duty of the conductor to accept it, and if you so find that plaintiff did thus offer to pay, your verdict must be for plaintiff."

5. ———: ———: BURDEN OF PROOF. The defendant could only escape liability for putting plaintiff off the train by proving the happening of the contingency upon which such right would accrue under section 1074, Revised Statutes 1899, and by further proving a compliance with all the provisions of such statute regulating the mode and place of its enforcement. Necessarily, the burden of sustaining this defense pleaded in the answer, rests upon the defendant.

6. Damages, Nominal: BREACH OF DUTY: PASSENGER, EJECTMENT OF: STOPPING OF TRAIN: STATUTORY CONSTRUCTION. For a breach of the statutory duty, which, by virtue of section 1074, Revised Statutes 1899, requires that the train shall be stopped before the ejection of a passenger for the causes mentioned in the statute, defendant is clearly liable for nominal damages, irrespective of any injury caused thereby to plaintiff.

7. ———: ———: EVIDENCE: CUSTOM: CREDIT-SLIPS. Evidence tending to prove that it was the usual custom and habit of conductors on defendant's road to issue to passengers, upon payment of cash fares, credit-slips upon contracts for rebate, is competent.

Appeal from Shelby Circuit Court.—*Hon. Nat M. Shelton,* Special Judge.

REVERSED AND REMANDED.

STATEMENT OF THE CASE BY THE COURT.

This action is for the unlawful ejection of a passenger

from a train of defendant, which the petition alleged was done by the conductor in a rude, angry and violent manner to the great bruising and injury of plaintiff's body. The petition asked judgment for $1,000 for actual damages occasioned by physical injuries, loss of time and business, and $1,400 as punitive damages.

The answer avers that plaintiff was put off the train because he refused to pay his fare and denies the other allegations of the petition.

The evidence for plaintiff tends to show that on June 13, 1899, he applied to the station agent of defendant at Shelbina for a ticket to Quincy, Illinois, at the same time laying down a ten-dollar bill in payment and exhibiting a contract for a rebate upon the purchase of a certain number of tickets, which contract entitled him to receive a credit certificate for each ticket bought until the sum specified was expended for tickets. The station agent prepared the ticket requested, the cost of which was $1.60, and after looking in his drawer and finding only silver in the sum of about $3.40, proposed to plaintiff to wait until the train arrived when he, the agent, would get change for the ten-dollar bill from the conductor, and hand plaintiff a five-dollar bill, $3.40, the change already on hand, and the ticket for $1.60, thus completing the transaction. In a few moments the train arrived and the station agent, in company with plaintiff, approached the conductor and requested him to change the ten-dollar bill; the agent explaining that plaintiff wished to get a ticket to Quincy, and had a credential contract and nothing less than $10 to pay for it. The conductor refused to change the ten-dollar bill, but said to plaintiff, if he wanted to go to Quincy to get on the train. That thereupon plaintiff boarded the train and after taking his seat was approached by the conductor who demanded his fare. He answered he had no ticket, as the conductor knew, but wanted

Holt v. Han. & St. Joe Ry. Co.

to be protected in paying his fare by getting a credit slip for the amount thereof to be used as a future basis for rebate on the said mileage contract.   What was then said and done is thus detailed in plaintiff's examination :

"I says, 'you asked me to come in here and I want the benefit of my credential.'   He says, 'Damn you, I want your fare, I have got no time to monkey with you.'   I says, 'you can issue me a credential or fix me up a statement, you understand the situation.'   He says, 'What are you going to do?'   I says, 'What are you going to do?'   He says, 'Damn you, I will put you off.'   I says, 'Don't you put me off.'   He says, 'I want your fare and I want it damned quick, what are you going to do?'   I says, 'Are you not going to issue a credential?'   He jerked the bell cord and the train began to slow up.   I says, 'Although it is unfair and unjust, rather than be put off the train this time of night, I will pay my fare.'   He then signalled by pulling the bell cord, signalled them on.   He then says, 'I want your fare and I want it damned quick.'   I says to him, 'Will you please, sir, go through the train and then come back and see me.'   He then says, 'Damn you,' and gave me a grab and started with me towards the vestibule.

"Q.   Did he take hold of you?   A.   He grabbed me by the left arm and jerked me up, or jerked me out of the chair, the chair was a reclining chair.   When he grabbed me up, says I, 'Take this fare, don't you put me off.'   He says, 'Damn you, you have got to get off here,' and he pushed me on into the vestibule.

"Q.   Was he before you or behind you?   A.   He was behind me pushing me on.   When he got out into the vestibule he pulled the cord.   I says, 'Take this fare and don't put me off this time of night.'   He says, 'Damn you, you have got to get off.'   He then opened up the vestibule and pushed me down.   Then he says, 'Take your grip or I will throw it off.'

I took my grip. The train was slowed up and he pushed me down. I fell and struck this side of my face on the coal cinders and bruised my leg."

Plaintiff also testified as to other injuries occasioned by his expulsion from the train, and his great chagrin and mortification occasioned by the violence of the conductor in throwing him from the train. He further stated that he had in his hand the ten-dollar bill and tendered it in payment of his fare before and until he was put off the train. The conductor's version of the transaction is, that when he asked plaintiff for his fare it was refused unless he would give plaintiff a credit slip for the amount thereof to protect him in his credential contract, whereupon he proposed to put plaintiff off and signalled the train to stop. That after it stopped, plaintiff offered to pay his fare, when he signalled the train to resume its journey and again approached plaintiff and demanded his fare and after some words plaintiff positively refused to pay his fare and that he put him off the train. That in so doing the only violence he used was to break the hold which plaintiff took on one of the brass rods in front of the car window when he reached the platform. That after this was done, plaintiff alighted and he closed the vestibule door and saw no more of him. The case was submitted to a special jury and a verdict and judgment rendered for defendant, whereupon plaintiff appealed to this court.

*W. O. L. Jewett & Son, O. D. Jones* and *R. A. Cleek,* for appellant.

(1) On the undisputed testimony plaintiff was entitled to recover. (a) It is admitted that he applied to defendant's station agent "in reasonable time" to get a ticket and made a tender of his money (ten dollars), to pay a $1.60 fare, a rea-

sonable tender.   Defendant's agent made out the ticket and took the time and responsibility of changing the bill.   If he had refused to do it, Holt had ample time, fifteen or twenty minutes, to obtain change.   Its agent took his time and opportunity to do it, with its agent "the conductor," who in an unreasonable, willful manner, refused.   (b)   According to the admitted facts and testimony plaintiff became a passenger on entering defendant's train in good faith, attempting and intending to pay for a ticket; and defeated in it only by the unreasonable conduct of its own agents.   Perkins v. Railroad, 55 Mo. 201; Brown v. Railroad, 66 Mo. 588.   It was the duty of defendant by law, and under its control, to furnish reasonable facilities to passengers to buy tickets even on freight trains.   Cross v. Railroad, 56 Mo. App. 664; Cherry v. Railroad, 52 Mo. App. 503; Berkett v. Railroad, 39 N. E. Rep. (Ind.) 429.   Who, in the light of the admitted testimony in this record can say, that defendant afforded plaintiff reasonable or any facilities to buy a ticket for its scheduled regular passenger train?   Its facilities were a delusion.   Station agent took plaintiff's time and opportunity to change the ten-dollar bill; applied to its conductor who admits he could have done it if he chose, or could have given the "credit slip" and refused both, and now denies that he "recognized" the station agent.   Cloes v. Railroad, 32 N. E. Rep. (Ind.) 588.   (2) The instructions given for defendant are erroneous and plainly irreconcilable with, and contradictory of those given for plaintiff.   Such are ground for reversal.   Frank v. Railroad, 57 Mo. App. 181.   "An instruction on the whole case, must be so framed as to justify a recovery on the hypothetical facts therein stated, without excluding from consideration of the jury the evidence offered by the adverse party."   McNichols v. Nelson, 45 Mo. App. 446; Hohstadt v. Daggs, 50 Mo. App. 240; State v. Brumley, 53 Mo. App. 126.

*Spencer & Mosman, Geo. W. Humphreys* and *J. D. Dale* for respondent.

(1) The failure to furnish change, even though willful, gave plaintiff no right to demand a rebate which, by the terms of his contract, he had expressly agreed to waive.   It was, at most, but a refusal to accord to him an accommodation which no rule of law required him to accord in that situation and under those circumstances.   But if it was his duty to accord it, his failure to accord it does not justify plaintiff in refusing to pay his fare unless protected in his rebate.   That is not his remedy.   Kellett v. Railroad, 22 Mo. App. loc. cit. 369; Davis v. Railroad, 53 Mo. 317; Marshall v. Railroad, 78 Mo. loc. cit. 616; Griffin case, 68 Ill. 499.   (2) As the Court of Appeals well says, "It was clearly the duty of the conductor when plaintiff entered defendant's train at a point other than that of transfer, not to receive the ticket and to require the payment of five-cent fare, and if plaintiff failed to make such payment, as he did, then defendant can not be held liable for putting plaintiff off the train without physical hurt or damage." Percy v. Railroad, 58 Mo. App. loc. cit. 80.   The foregoing language was used in respect to a mere regulation of the carrier.   In our case, Holt's express contract was that he was only entitled to a rebate when he purchased a ticket and presented it to the conductor.   The refusal to give the credit slip was perfectly right under the circumstances.   Counsel say: "Daley could have given the credit slip if he chose."   This is unfair.   Daley had no discretion in the matter.   He was bound to obey his instructions.   His position depended on the faithfulness with which he obeyed them.   Plaintiff had no right to exact of the conductor that he should imperil his position in order that he might secure a rebate of fifty-five cents,

Vol 87 app—14

which he had expressly agreed to waive. (3) "According to the weight of authority and the better reason, a passenger who has persistently refused to pay his fare or produce a ticket, can not gain a right to be carried and make the expulsion unlawful by a tender of the fare after the conductor has begun to expel him." 4 Elliott on Railroads, sec. 1637. (4) Payment of fare under the contract would not entitle him to a rebate. It was only the purchase of a ticket that could, under the wording of the contract, give him that right. Under the circumstances detailed in evidence, said instruction was willfully misleading.

BOND, J.—Under the common law, carriers of passengers for their own protection and for the comfort and convenience of the traveling public, were entitled to eject from their vehicles, without unnecessary force, any passenger who refused to pay the established fare for such transportation, or whose behavior was disorderly or who was infected with a contagious disease. In this, and many of the states, the doctrine of the common law on this subject has been superseded by statutes defining the causes and regulating the procedure for the lawful ejection of a passenger from the train upon which he has embarked. Our statute is, to-wit: "If any passenger shall refuse to pay his fare, or shall behave in an offensive manner, or be guilty of repeated violations of the rules of the company, it shall be lawful for the conductor of the train and the servants of the corporation to put him and his baggage out of the cars, using no unnecessary force, at any usual stopping place, or near any dwelling house, as the conductors shall elect, on stopping the train." R. S. 1899, sec. 1074.

It will be seen from the terms of the foregoing statute that a passenger can only be put off the train, for the reasons therein specified and in the manner therein prescribed, when it shall have been brought to a stop at one of its stations or

near any dwelling house.   With reference to these provisions, our statute is a literal copy of the one in force in the State of Wisconsin, and it has been uniformly held in that State that such a statute, by necessary implication, prohibits the forcible ejection of a passenger for refusal to pay his fare, except at the places and in conformity with the other conditions, specified in the statute.   Boehm v. Duluth Railroad, 65 N. W. Rep., 506, and cases cited.   And such is the uniform doctrine in other States having similar statutes.   I. V. Railroad v. Blanche Latimar, 128 Illinois, loc. cit. 171; St. Louis & Iron Mt. Railroad Co. v. Branch, 45 Arkansas, 524; Stephen v. Smith et al., 29 Vermont, 160.

A passenger is one who enters the vehicle of a carrier with the intention of paying in money the usual fare for his transportation, or who is supplied with a ticket or pass, entitling him to ride to a given point.   After his relation as such is established, the next inquiry in the construction of the statute is, what is meant by the terms, "shall refuse to pay his fare," upon which depends the *lawfulness* of his expulsion from the train.   This particular delinquency, unlike the other instances of misconduct mentioned in the statute, concerns the carrier alone and is of no interest to fellow travellers.   It authorizes a removal of the passenger upon the just principle that, he who refuses to pay shall be refused a ride. The law only imposes the duty of carriage for reasonable hire; it does not force carriers to perform this obligation without any compensation.   To protect them in the reasonable avails of their services, the statute (like the common law) permits them to compel payment of a just recompense under penalty of ejection of a recusant passenger.   In applying this wholesome doctrine, a greater number of the cases in other States have enounced the rule that although the passenger who has once refused to pay his fare may change his mind and offer to

pay his fare before any steps are taken for his expulsion and thus gain the right to complete his journey; yet the moment anything has been begun looking to his removal from the train, no submission thereafter, nor an actual tender of the fare during the process of his expulsion will make the same unlawful or entitle him to remain on the train. 4 Elliott on Railroads, sec. 1637, and cases cited; 1 Fetter on Carriers of Passengers, sec. 314. This rule is not, however, universal and its extreme rigidity is opposed to some well-considered cases in other states. L. & N. Railroad v. Garrett, 8 Lee (Tenn.) 438; Bond v. Railroad, 62 Texas, 442. In this State, the question as to whether the passenger may prevent his ejection if he actually tenders the money for the fare after the process of expulsion has begun but before it is completed, has not been directly decided. The remarks of the court in Perkins v. Railroad, 55 Mo. 211, are far from determinative in themselves. The appeal in that case was by the defendant railroad and the principal question reviewed was the liability of such corporations for punitive damages. In considering, however, the receivability of the evidence introduced by the respondent going to show that while he was being put off the train for refusal to pay the full fare demanded, a fellow passenger offered to pay the balance of his fare, the court remarked that the trial court had correctly instructed that such evidence was "not proper to show that plaintiff was from that time entitled to remain on the car." It is evident that the mere offer or expression of a willingness to pay, whether by a passenger or other person, is quite a different thing from the actual tender of the money. The former would not be considered in a matter of contract for the payment of money, as of any legal efficacy whatever, while an actual tender would, under such circumstances, completely stay the running of interest on a matured debt. Besides, the mere offer to pay fare might be

followed by subsequent refusals of actual payment *ad infinitum;* and if that alone were sufficient grounds for the cessation of the ejection of a non-paying passenger, the railroad companies might find it out of their power to adhere to any schedule as to time in the running of their trains, and the travelling public might be subjected to the annoyance and inconvenience of repeated stoppages of the train thus occasioned. No such consequences, however, could ensue if, after a first refusal, the carrier was only required to cease the ejection of a non-paying passenger upon actual tender of the fare; for by receiving the money thus tendered, the company would at once get its own and escape even the delay attending a complete expulsion of a passenger, and necessarily avoid any future repetitions of the delay in running its train, incident to controversies over fare with a passenger of a vaccilating mind. If the rulings as to the effect of second offers to pay fare in prevention of expulsion had been made to conform to this *essential* distinction between the actual tender of the money, and the mere promise or offer to pay, they would rest upon a just and rational basis which would effectually prevent any of the mischiefs sought to be escaped by the doctrine of the finality of the first refusal to pay fare, as a ground of lawful ejection. A passenger is entitled to a reasonable indulgence in the discussion of his rights and duties in the payment of fare when it is demanded by the agent of the company. This is illustrated in the case at bar. Here the uncontradicted evidence shows that the plaintiff had voluntarily sought to get a ticket before boarding the train and also a credit slip in pursuance to a contract to give him a rebate after purchases of tickets to a certain amount which was binding on the defendant; that his difficulty in this matter was explained to the conductor by the station agent of defendant. What is more natural than that the plaintiff, when approached on the train for his fare

should endeavor, while paying it, also to secure from the conductor a credit slip such as the station agent would have given him before boarding the train if the ten-dollar bill, tendered in payment, could have been changed. Nor do we think his insistence upon this to a certain degree was unreasonable, especially in view of the testimony which plaintiff proffered, but which was excluded by the court, tending to show that it was the habit and custom of the conductors on defendant's road to issue just such credit slips in similar cases. Under these special circumstances, the subsequent actual tender of the money for his fare by plaintiff, if made before or during the process of his expulsion by the conductor, should have been accepted and he should have been allowed to remain upon the train. We therefore think that instruction number four, requested by plaintiff and refused by the court, is applicable to the phase of the evidence presented by the testimony given for plaintiff and that such instruction should have been given. The instruction is, to-wit: "4. Although the jury should find that plaintiff did at first refuse to pay his fare, yet, if, when he saw the conductor was stopping the train to put him off, he then changed his mind and offered to pay and tendered to the conductor the money for his fare, it then became the duty of the conductor to accept it, and if you so find that plaintiff did thus offer to pay your verdict must be for the plaintiff."

II. The learned trial court also erred in refusing the instruction (number 6) requested by plaintiff to the effect that the burden of sustaining the affirmative defense set up in its answer, by a preponderance of the evidence, rests upon the defendant. The defendant could only escape liability for putting plaintiff off the train by proving the happening of the contingency upon which such right would accrue under the statute, supra, and by further proving a compliance with all the provisions of such statute regulating the mode and place

of its enforcement. Necessarily, the burden of sustaining this defense pleaded in the answer, rests upon the defendant.

The learned trial court also erred in giving instruction number ten at the request of defendant, which stated substantially that plaintiff would not be entitled to recover upon evidence that he was put off defendant's train while it was *in motion*. This instruction is diametrically opposed to the provisions of the aforesaid statute, which requires that the train shall be stopped before the ejection of a passenger for the causes mentioned in the statute. For the breach of this statutory duty, defendant was clearly liable for nominal damages, irrespective of any injury caused thereby to plaintiff. If any injury resulted to plaintiff from his ejection while the train was in motion, then defendant would also be liable for substantial damages, but its infraction of any one of the statutory provisions regulating the right of expulsion—whether as to place or stoppage of the train—of itself entitles an expelled passenger to recover nominal damages regardless of the infliction of any other injury upon him. 2 Rorer on Railroads, p. 666, and cases cited; 45 Arkansas, supra, loc. cit. 529.

The learned trial court also erred in excluding the testimony tendered by plaintiff to prove that it was the usual custom and habit of conductors on defendant's road to issue to passengers, upon payment of cash fares, credit slips upon contracts like the one exhibited by plaintiff. Such evidence had a tendency to show a waiver by defendant of the requirement in such contract with reference to the obtention of such credit slips from station agents at the time of purchase of tickets. If it went to the extent of showing a general custom and habit on the part of the conductors to issue such slips, it was clearly competent, and it makes no difference whether plaintiff was advised of the authority thus conferred upon defendant's conductors before entering the car; he had the right,

if the authority existed, to demand its exercise. It is the fact of agency which binds the principal, not knowledge thereof by the party dealing with the agent. If the authority to issue such credit slips was confided by defendant to the conductor in charge of its train when plaintiff was put off, then his ejection was unlawful, and in the event of proof of such authority on another trial the jury should be so instructed.

For the foregoing reasons the judgment herein is reversed and the cause remanded. Judge *Bland,* concurs. On motion for rehearing (which was overruled) Judge *Goode* withdrew his concurrence and dissented.