# BECK, Respondent, v. QUINCY, OMAHA & KANSAS CITY RAILROAD COMPANY, Appellant.

### St. Louis Court of Appeals, February 4, 1908.

1. **CARRIERS OF PASSENGERS: Ejection of Passenger: Intention to Pay Fare.** In an action against a railroad company by a passenger for wrongful ejection from the defendant's train, where on the entire evidence it was doubtful whether the plaintiff's purpose on boarding the train was to beat his way or whether he intended to pay his fare, that issue was a question for the jury, although the plaintiff did not tender a ticket or his fare when first accosted by the conductor, but referred the conductor to another passenger who, he said, would pay it, it appearing that the plaintiff was intoxicated, and that his intention was not clear from his conduct.

2. ———: ———: ———: **Offer to Pay after Ejection Begun.** And in such case if the first refusal was induced by bad faith, an offer to pay fare without tendering the money after the conductor had begun to eject the plaintiff from the car would not entitle him to ride, but the conductor was justified in continuing the expulsion.

3. ———: ———: **Malice.** Where a conductor of a railroad train ejected a passenger for nonpayment of fare, and the evidence tended to show that he refused to accept the passenger's tender of the fare, and threw him violently from the train at a spot distant from a railroad station or residence, showing bad feeling towards the passenger, such conduct was evidence of malice so that that issue was properly submitted to the jury in an action by the passenger for such ejection.

4. ———: ———: **Trespasser: Ejection at Point not Usual Stopping Place.** Under section 1074, Revised Statutes 1899, the ejection of a passenger for the nonpayment of his fare, by the conductor of a railroad train, even with no violence, at a point on the railroad which was not a usual stopping place or near a dwelling house, would entitle the passenger to at least nominal damages for such expulsion, provided he took the train with the intention of paying his fare, but if he took passage with the intention of beating his way, he was a trespasser and not protected by the statute.

5. **TRIALS: Remarks of Counsel: Discretion of Court.** Considerable discretion is entrusted to the trial courts in preserving proper conduct during trials and preventing improper remarks to be made by counsel in arguments, but such discretion is subject to review.

6. ———: ———: In an action against a railroad company where counsel for the plaintiff in his argument to the jury asserted that the history of the litigation shown by the papers was that the employees of the railroad were compelled to color the truth, and made other remarks of a contemptuous and insulting nature respecting the defendant, and where the verdict showed that passion and prejudice seemed to have influenced its rendition, it was reversible error.

Appeal from Knox Circuit Court.—*Hon. Chas. D. Stewart,* Judge.

REVERSED AND REMANDED.

*O. D. Jones* and *J. G. Trimble* for appellant.

Peremptory instruction to find for defendant should have been given. Plaintiff had no intention of paying fare when he got aboard the train, and refused to pay when called on by the conductor. He was a trespasser, and his removal was lawful. Logan v. Railroad, 77 Mo. 663; Lillis v. Railroad, 64 Mo. 464; Gilbert v. Nagle, 118 Mass. 278; Condran v. Railroad, 67 Fed. 522; Holt v. Railroad, 174 Mo. 524; Gates v. Railroad, 102 S. W. 50. Plaintiff's instruction numbered 1 was erroneous. The effect of this instruction is that if the plaintiff tendered to the conductor the amount of his fare at any time before he was actually removed, the conductor was legally bound to receive it, regardless of plaintiff's conduct, intentions and purposes, and regardless of how far said conductor had gone toward ejecting plaintiff. In so ruling the trial court erred. There is no authority to support said ruling. Unquestionably the general rule, and the rule supported by the overwhelming weight of authority is as stated in 6 Cyc. of Law. and Prac. 554; Garrison v. Railway (Md.), 55 At. 371; Hoffbauer v. Railroad, 52 Iowa 342; O'Brien v. Railroad, 80 N. Y. 236; Garrison v. Railway (Md.), 55 At. 371; Moore v. Railroad, 38 S. Car. 1; Railroad v. Johnson, 92 Ala. 204.

*F. H. McCullough, Balthrope & Smith,* and *Cyrus R. Fowler* for respondent.

In answering the brief of appellant in this case, we find that in most instances, the counsel for appellant has correctly stated the law, but fails to properly apply the rule, as stated, to the facts in this case. In Holt v. Railroad, 174 Mo. 524, the proper rule is stated and this case comes squarely within such rule. The following cases are in point here, and are quoted by appellant, but absolutely fail to fit his side of the case, viz: Logan v. Railroad, 77 Mo. 663; Lillis v. Railroad, 64 Mo. 646.

STATEMENT.—The purpose of this action is to recover damages for the alleged unlawful expulsion of plaintiff from one of defendant's passenger trains. This train left the station of Edina, where plaintiff was, February 4, 1905, some time between eight and ten o'clock in the evening. It was bound west for Hurdland, plaintiff's home, a station seven miles west of Edina. Plaintiff's own testimony and that of other witnesses, proves he had been loitering about a saloon in Edina kept by Hal Tyhurst during the entire day, had spent all his money and become intoxicated. According to some testimony he was quite drunk in the evening when he got on the train, but there was testimony which indicates he was then nearly sober. Before leaving Tyhurst's saloon to go to the station, plaintiff borrowed twenty-five cents from Tyhurst to pay the railroad fare to Hurdland, saying he had spent all his money; and on the way from the saloon to the station he fell in with a man by the name of Fox, who intended to take the same train he would travel on, and asked Fox to pay his fare. Plaintiff did not swear Fox agreed to do this, and Fox swore he did not. Reaching the station some time before the train came, plaintiff began to annoy a negro who was standing on the platform, and persisted in this

conduct until the negro shoved him off the platform on the track, where he would have been killed by the approaching train had not Fox dragged him off the track when the train was but fifteen feet away. Plaintiff boarded the train and as soon as it moved out of the station the conductor asked for his fare. Plaintiff said Fox, who had gone to an adjoining car, would pay for him, and the conductor passed on to the next car. He soon returned and told plaintiff Fox had refused to pay plaintiff's fare which was true. The night was wild, with a snowstorm raging. The foregoing statement of facts is according to the narratives given by all the witnesses, including plaintiff; but at this point the plaintiff's version diverges from the versions of the other witnesses, and he was contradicted, in the main, by every one of them in so far as they testified about the same occurrences he did. He swore the conductor, after telling him Fox had refused to pay his fare, immediately seized him, jerked him out of his seat, and the conductor and a brakeman hustled him along the aisle of the car and on the platform, from whence he was flung with violence to the ground knocking him unconscious. He swore, further, he told the conductor just as he took hold of him, he had the money to pay his fare, offered to pay it and as he was being forced along the car drew the money from his pocket and tendered it, but the conductor said it was too late. Plaintiff swore, too, the conductor said he (the conductor) had been waiting for this opportunity, at the same time saying plaintiff was too late with his offer to pay. Plaintiff swore further he tendered payment as soon as the conductor took hold of his arm and commenced taking him to the door of the car and kept up the offer until he reached the second step, but the conductor only repeated the remark that it was too late. According to plaintiff he was ejected from the car about two miles west of Edina. George Simpson testified the conductor came

along shortly after the train started and asked plaintiff
for his fare and plaintiff said Fox would pay it.   The
conductor went into the other coach, came back in about
five minutes and told plaintiff Fox would not pay the
fare and plaintiff must pay it.   Plaintiff then asked El-
mer Chadwick for the money.   Chadwick refused to let
him have it, and about that time the conductor called
a brakeman; grabbed plaintiff by the collar and arm
and led him out the door.   The witness swore he heard
nothing further said in the car, but after plaintiff had
been put off the train, and it had started, he heard
plaintiff say he would pay the fare, and the conductor
said it was too late.   Simpson described the way in which
plaintiff got off or was put off the train by saying he was
sitting down and "just scooted off the steps; no one
shoved him."   This witness said the incident occurred
twenty telegraph poles west of Fabius bridge, other-
wise known as Lycan farm crossing, at the east end of
the first cut west of Edina, and that the telegraph poles
were eighty feet apart.   He said he thought the lights
of Edina could be seen from this place.   John Heenan,
who sat across the aisle from plaintiff, said the conduc-
tor came in and asked Beck for his fare and Beck said
Fox would pay it.   The conductor then collected some
other fares, went into another coach and came back
again, took hold of plaintiff and said if he didn't pay
his fare he would have to get off; taking him to the door.
Fox testified to seeing plaintiff drunk about the station
at Edina and his affray with the negro Ed Miller, in
which Fox rescued him from the track just before the
train reached him.   He testified, also, to seeing plaintiff
get on the train at Edina.   Fox went into another car
and next saw plaintiff at Lycan crossing after the train
stopped; saw him standing on the north side of the track
as the cars were moving away.   Fox testified the con-
ductor asked him if he was to pay any person's fare,
and he stated he was not to do this and had not agreed

to pay Beck's fare. Fox swore positively Beck was standing on the track when the train left him. The witnesses quoted from were introduced by plaintiff. W. H. Green testified for defendant he was a passenger in the smoking car and heard what took place between the conductor and Beck. The conductor asked Beck for his fare and Beck said Fox would pay it. The conductor went in another car, was gone not more than a minute, came back and said Fox was not paying plaintiff's fare and plaintiff would have to pay or get off. Plaintiff was not dragged out of the seat, but went to the door. He offered to pay the conductor after he got off; said he would pay his fare. This witness was sitting on the side from which Beck left the car and had the window open. Witness thought Beck said after the train started, he had twenty-five cents and would pay his fare. He was put off at mile-post No. 48, west of Edina; mile-post No. 47 being at Edina and just east of the station. W. B. Pickett for defendant swore he sat close to Beck in the car. Beck was in the rear end. When the conductor came in he asked Beck for the fare and the latter said Fox would pay it. The conductor went in another car, was gone about two minutes and returned and said Fox would not pay it. Beck retained his seat and the conductor took him by the collar and led him out of the car. He heard the conductor ask Beck twice for his fare and Beck asked Elmer Chadwick for money to pay it. Chadwick testified he was four or five seats from Beck on the opposite side of the car and in front of him. Bunnell, the conductor, asked for plaintiff's fare and Beck said Fox would pay it. Bunnell went into the next car and came back and asked for the fare again. Witness did not hear Beck's reply. The conductor said Beck would have to get off, tapped him on the shoulder and he walked out. Beck asked the witness for twenty cents to pay the fare and witness said he "was broke." T. D. Forester testified he saw Beck at Edina on the

Beck v. Railroad.

platform and was in the same coach with him. Beck was asked for his fare and said Fox would pay it. Bunnell went into the other coach came back and said Fox had refused to pay the fare and Beck would have to get off. Beck told the conductor he did not have any money and the conductor said he would have to get off. The train was stopped and Beck stepped out; did not see Beck offer any money to the conductor. G. Y. Bunnell, the conductor, testified he asked Beck for his fare about the time the train started, because he had had trouble with him before when he refused to pay fare. When asked for his ticket on this occasion Beck said Fox would pay for him, but Fox did not. Witness came back and told Beck he would have to get off. Witness tapped him on the shoulder and he walked out of the car to the lower step and slid off onto the right of way. After the signal was given and the train was starting, he offered to pay his fare, but witness said it was too late. As the train left Beck was standing on the right of way. On cross-examination this witness said Beck had refused to pay his fare on two other trips and was allowed to ride to Hurdland, because the train was on a grade, when his fare was requested, where it could not be stopped. The conductor positively denied Beck offered to pay his fare on the platform, but said he shoved his hand in his pocket. T. C. Clinkerbeard, a brakeman on the train, swore in regard to the manner Beck left the train that he sat down and "kind of scooted off;" and when the train left Beck was standing at the side of the track. William Fredericks, another brakeman, swore he first saw Beck sitting in the smoker. As the train pulled out of Edina the conductor started to take tickets and Beck said Fox would pay his fare. Bunnell went into the next coach and returned saying Fox would not pay and Beck would have to get off. The conductor told witness to set the air on the train and witness did so and opened the door of the car and walked

out.  Beck came walking out, got down on the second step, the rear step, and slid off; and as the witness signalled to go ahead Beck put his hand in his pocket and said he had money to pay his fare.  Witness got on the rear coach and saw Beck standing on the right of way as the train pulled out.  This occurred between mile post 47 and 48.  The last witness saw of Beck he was coming up the track.  Witness swore there was something of an embankment of fill there, but Beck did not fall down any embankment.  William Lang testified in behalf of defendant that he was a passenger in the rear coach.  After the train started from Edina the conductor came and asked a man if he would pay Beck's fare.  This man said: "No, sir."  The train stopped; witness wanted to see what was going on and went to the rear door and saw a man standing on the track.  This was after the train started.  The man was following the train.  One witness corroborated Beck about the distance from Edina to the place of the expulsion, saying it was two miles; but by the great weight of evidence it was from a half to three-quarters of a mile away, and in ordinary weather the lights of Edina were plainly visible; though some witnesses were unable to say whether the lights would be visible on a snowy night.  The trainmen, and perhaps another witness or two, swore the lights were visible when Beck alighted.  The foregoing is, in substance, the testimony regarding the ejection of plaintiff from the train.  We resume his own narrative at this point.  He said he was badly bruised by the fall when flung from the platform and when he regained consciousness after the train had gone, it was very dark and about ten o'clock at night.  He left the railroad track and walked until he came to the farmhouse of a man named Burch; then wandered around until he saw a tent and log house where no one lived.  This was south of the railroad and plaintiff thought he had been going in a circle.  He was nearly worn out and feared he would

freeze to death. About twelve o'clock, as the witness believed, he came to the railroad again and found a log house in which some hogs were lying. He scared them out and endeavored to get warmth from the bed they had occupied. The hogs kept coming in, so he left that house and went on the railroad, which appeared to be running north and south. He next came to a feed yard of a man named Hunolt about four o'clock in the morning, and there he scared some hogs out of their bed and lay in it to get warm. He lay in this bed of the hogs for about twenty-five minutes; then arose and struck a wagon road in which the snow was so deep he could hardly move. It continued to snow all night. He stopped at the house of a man named Clary and was taken in, warmed himself by the stove and Clary took off his shoes and he lay down on the bed. His hands were frozen. He was almost frozen to death. There was a deep gash in the side of his head and one on his knee. The witness swore his hands and feet were frozen permanently and since said night he had had a cough, was unable to do a day's work, had been bothered with bleeding from the lungs, though he never had experienced such a symptom before and was in a bad condition generally. In the morning he was sick until he could clear his lungs of phlegm; sometimes he had bleeding from the lungs for four to six weeks. He swore he had been prescribed for by a physician since the occurrence. No physician was called as a witness. Louis Clary swore plaintiff came to his house and was in a pretty bad condition; was white and had been out in the snow. Witness pulled off his shoes and gave him something to eat. Witness noticed no bruise, scars or scratches on his face. Plaintiff said he was almost frozen to death and witness told him he was nowhere near frozen. The jury returned a verdict in plaintiff's favor for $1 actual and $1,000 punitive damages; and judgment having been entered in accordance with the verdict, this appeal was prosecuted.

The cause of action the petition charges is that at a point about two and one-half miles west of Edina and four and one-half miles east of Hurdland, where there is a deep cut or embankment and where there is no dwelling house, and during a snowstorm and freezing weather, a conductor on one of defendant's trains, wrongfully, wantonly, maliciously and without just excuse, and in violation of plaintiff's rights as a passenger on said train, committed an assault with force and violence on plaintiff, though he had tendered the legal fare from Edina to Hurdland, and then and there, with insult and injury, and great and unnecessary violence and force, with the assistance of one of the train men, expelled plaintiff from the train, and with great force and violence threw him against the frozen ground; that in consequence of this plaintiff suffered great bodily injury to his hips, legs, head and spine and a great shock to his nervous system, becoming unconscious and remaining so for some time; that his face and hands and feet became frosted and frozen. The answer denied plaintiff was admitted as a passenger as alleged in the petition; denied plaintiff offered the conductor his fare; denied an assault on plaintiff by the conductor, or that he was thrown with great force and violence to the ground, or suffered the injuries alleged. For further answer it was averred plaintiff entered the car without having purchased a ticket, and intended to ride to Hurdland without paying his fare; that when repeatedly requested by the conductor to pay his fare, he refused, and on account of his refusal the conductor, as he had a lawful right to do, stopped the train and put plaintiff off, using no more force than was necessary.

Complaint is made of remarks and conduct of plaintiff's attorney during the trial and in the presence of the jury, such as the following. During the cross-examination of one of defendant's witnesses, plaintiff's attorney said, in the hearing of the jury: "I guess these fellows

think they are the only persons who can tell the truth; they will all swear alike, and" addressing defendant's attorney, "you have your gang here; you know it." In beginning the cross-examination of another witness of defendant, plaintiff's attorney said: "This is another of the gang." In commenting on statements of one of defendant's witnesses, plaintiff's attorney said, in the hearing of the jury: "That is about like the rest of your stories." This was in reference to some testimony of the conductor. The conductor was also asked on cross-examination, if he did not take delight in putting a man off the train, and if he was not that kind of a man? Upon an objection being interposed by defendant, plaintiff's attorney said: "Of course you object; you are trying to save him." One of defendant's witnesses, Fredericks, the brakeman, was asked if he had not given his name as Jones to a passenger he had expelled from a train, and again, if said man did not receive damages from the defendant company for the ejection. This question was objected to, and the court said it had not been answered, but would be allowed to remain in the record. In the opening argument one of plaintiff's attorneys said: "The history of litigation as shown by the papers is, employees of railroad corporations are compelled to color the truth;" and on being admonished by the court not to go outside the evidence, he replied: "I am not. The court in a case I had, said I had a right to draw my conclusions as I am now drawing them." In the closing argument, an attorney for plaintiff said: "Abe Beck is contradicted only by these corporation henchmen." An objection was interposed, but the court made no ruling and defendant excepted. Again in the argument, the attorney for plaintiff said: "That is no excuse for the henchmen of this railroad corporation hounding him." When the defendant's counsel inter-

129 App—2

posed an objection, the attorney for plaintiff said: "That is what I said; these corporation henchmen." Thereupon the court told plaintiff's attorney he should not make such remarks.

GOODE, J. (after stating the facts)—1. An assignment of error is raised against the first instruction given for plaintiff, which advised the jury that if they believed plaintiff when he was admitted into defendant's train at Edina, intended to pay his fare to Hurdland, and after the train left Edina and reached a point between that station and Hurdland, a point not a usual stopping place or near a dwelling house, the conductor wrongfully and without just cause, ejected plaintiff from the train after plaintiff had tendered the conductor the legal passenger fare from Edina to Hurdland, the verdict should be for plaintiff. One objection urged to this instruction is that the evidence as a whole shows plaintiff boarded the car with the intention of beating his way to Hurdland instead of paying fare and, therefore, never became a passenger, and the court erred in submitting to the jury the question of plaintiff's intention to pay his fare. This point may be considered in connection with defendant's exception to the refusal of the court to direct a verdict in its favor, which is founded on the same theory, namely; that plaintiff had no intention of paying his fare and therefore was a trespasser from the first. No doubt plaintiff was guilty of acts indicating he was endeavoring to evade payment of fare, though he borrowed money from Tyhurst ostensibly to pay it. When his fare was demanded, instead of using the borrowed money, he referred the conductor to Fox, who had not agreed to pay for his passage; and some of the witnesses say when the conductor again demanded a fare after Fox had refused to pay, plaintiff said he had no money and tried to borrow from Chadwick. Witnesses also swore no offer was made to pay until plain-

tiff had been ejected from the car. But plaintiff swore unequivocally he offered to pay as soon as he was informed Fox would not, and instead of his offer, and even tender of the money, being accepted by the conductor, he was immediately seized and ejected from the train. Plaintiff was more or less intoxicated, and may have acted foolishly without intending, either when he boarded the train, or when his fare was demanded, to beat his passage. On the entire evidence what plaintiff's purpose was became an issue for the jury. If he went on the train intending to pay his fare, he was a passenger and not a trespasser. [Holt v. Railroad, 174 Mo. 524, 74 S. W. 631.] And, according to the opinion in said case, if plaintiff was acting in good faith, though he did not tender a ticket or the fare when first accosted by the conductor, if he tendered the money when it was demanded the second time, it was the duty of the conductor to accept it; at least if plaintiff's version of the incident is the true one; for he swore he was seized and his ejection from the car began simultaneously with his inquiry of the conductor as to whether Fox had refused to pay for him and while he himself was expressing a willingness to pay. It is argued for defendant that the doctrine of the Holt case is an exceptional one, and applicable only to cases in which the passenger went on the train in good faith and with a ticket which he believed entitled him to passage, but which was not available because the time limit on it had expired, or for some other reason. Under such circumstances only say defendant's counsel, is it the duty of a conductor, after a train has been stopped for the purpose of ejecting a passenger, to accept the latter's tender of fare. Numerous authorities can be found to support the proposition that, if a person on a train refuses to pay for his passage or produce a ticket when the conductor asks for a fare, and thereupon the conductor takes measures to stop the train for the purpose of ejecting the recusant, the latter by then ten-

dering payment, does not gain the right to ride and make. the further prosecution of the ejection unlawful. [2 Hutchinson, Carriers (M. & D. Ed.), sec. 1085; sec. 591a original edition.] In this treatise no distinction is taken between an offer to pay fare and a tender of the money; but the text says the prevailing rule and the one supported by the better reasons, is that a subsequent tender after a previous refusal to pay, does not entitle the traveler to ride, though he may acquire the right by complying with the conductor's demand at any time before the process of ejection is begun; that if the refusal is persisted in after reasonable time and opportunity to comply and until the ejection has been begun by stopping the train, or otherwise, the passenger forfeits his rights and the ejection may be completed though performance is tendered by the passenger. The opinion in the Holt case draws a distinction between an offer to pay fare after the conductor has started to eject the party, and an actual tender of money to the conductor, holding if a passenger has been acting in good faith and with the intention of paying for his passage, either by a ticket which he believed to be good, or cash, the conductor must accept the fare if tendered after the expulsion of the passenger has begun and cease further to molest him. The idea of the Holt opinion is that a mere offer, without a tender of the money, may be withdrawn, and the other passengers on the train annoyed by delays growing out of repetitions of sham efforts to pay; whereas if money is tendered this cannot happen because the conductor may accept the money and permit the recusant passenger to ride. But if the latter was acting in good faith from the first, which the opinion assumes as the basis of any consideration for him, the danger of his making successive offers to pay and immediately withdrawing them when the train is stopped to expel him, is imaginary. We do not understand the Holt case to impair the force of the previous decision in the Lillis case, that a

person is a trespasser if he intends to ride without paying and, in pursuance of this purpose, buys no ticket and refuses to pay a fare when it is asked. If bad faith and a fraudulent motive induced the refusal and the conductor had begun to eject the trespasser, we think the decision in the Holt case would not require the expulsion to cease. We have held there was evidence for the jury on the issue of whether plaintiff took passage on the train intending to pay his fare and still had this intention during his interviews with the conductor. If these facts are found in his favor, and also that he tendered his fare after first refusing it, but not until steps had been taken to eject him, nevertheless, under the Holt decision his expulsion was wrongful.

It is said the first instruction given for plaintiff conflicts with the second one for defendant, which told the jury, if they found plaintiff offered to pay his fare, but before making the offer he had refused to pay, and the conductor had signalled to stop the train for the purpose of removing plaintiff, a subsequent offer did not entitle him to be carried on the train and the conductor was under no obligation to permit him to ride. Under the Holt case an offer to pay, not accompanied by a tender of the money, would be insufficient to put the conductor in the wrong in going on with the expulsion. In the first instruction given for plaintiff, his right to continue on the train after he had failed to pay his fare when it was first demanded, was made to depend on a subsequent tender. The two instructions are reconcilable by the distinction taken in the Holt case.

2. Complaint is made of the second and third instructions given for plaintiff, because they submitted the case to the jury on the supposed wanton and malicious conduct of the conductor when there was no testimony to show the conductor acted wantonly and maliciously. Plaintiff swore that on his tendering the fare, the conductor said it was too late and he (the conductor) had

been waiting for such an opportunity, namely: an op-portunity to expel plaintiff from the train. The con-ductor in his cross-examination said he had had trouble with plaintiff before about fares and was a little "sore" at plaintiff. Besides these circumstances in proof, if the conductor refused plaintiff's tender and threw him vio-lently off the train at a spot distant from a residence or station, such conduct was evidence of the intentional doing of a wrongful act without just cause or excuse, and therefore of malice. [McNamara v. Transit Co., 182 Mo. 676, 81 S. W. 880; Goetz v. Ambs, 27 Mo. 28; Trauerman v. Lippincott, 39 Mo. App. 478.] Without quoting the second and third instructions, which is un-necessary in view of the point made against them, we may say they did not err in submitting to the jury the question of malice on the part of the conductor; for the issue was inside the evidence.

3. If plaintiff took passage intending in good faith to pay his fare, and was acting in good faith during what transpired between him and the conductor—that is, if he neither boarded the train meaning to beat his way or undertook to do this after he boarded it— it is difficult to discern how a verdict for nominal dam-ages could be escaped; for if those were the facts a stat-ute of the state was violated in expelling him, even with no unnecessary violence, at a point on the railroad which was not a usual stopping place or near a dwelling house. [R. S. 1899, sec. 1074.] This statute has been construed to prohibit, by necessary implication, the ejection of a passenger for refusing to pay fare except at the places designated. [Holt v. Railroad, supra.] But this is true only in case the person ejected became a passenger by taking the train intending to pay for his transportation, either by a ticket believed to be good, or money. If he took passage with the intention of beating his way, he is regarded as a trespasser and not within the scope of the statute, which relates to passengers, and may be

ejected at any point on the line. [Lillis v. Railroad, 64 Mo. 464.] A carrier is bound to accord, even to a trespasser, humane treatment; not inflict brutal violence on him or employ more force than is needed to eject him; and likely throwing him out under circumstances indicative of inhumanity or reckless disregard of life, might entitle him to an action; for instance, if he was removed from the train far from any place of succor and under circumstances which obviously exposed him to loss of life or to serious injury. [2 Hutchinson, Carriers (M. & W. Ed.), secs. 978, 1082, 1083.] However, these possible qualifications of the general rule do not call for attention in the present case. The court below in instructing the jury fully conceded defendant's contention that if plaintiff went on the train with no purpose of paying fare, and later refused to pay until the conductor had taken steps to stop the train and put him off, plaintiff did not become a passenger and the conductor had the right to remove him from the car, using such force as was necessary, at a point which was neither a usual stopping place or near a dwelling house. The court instructed at defendant's request and on the evidence supporting its defense, in accordance with the opinion of the Supreme Court in the Lillis case. All the instructions requested by defendant except one for a verdict in its favor, were given.

4. It is earnestly insisted the judgment ought to be reversed because of improper remarks of the attorneys for plaintiff both during the introduction of testimony and the arguments to the jury. We have set out the expressions of counsel of which complaint is made and the rulings of the court on defendant's objections. Considerable discretion is entrusted to the trial courts in preserving proper conduct during a trial and preventing the utterances of statements or sentiments likely to mislead the jury regarding the evidence or unduly arouse their sympathies or inflame their prejudices. This dis-

cretion is not absolute and is subject to review. [Haynes
v. Trenton, 108 Mo. 123, 18 S. W. 1008; Evans v. Tren-
ton, 112 Mo. 390, 20 S. W. 614.] Trials before juries
ought to be conducted with dignity and in such manner
as to bring about a verdict based solely on the law and
the facts. Hence reckless assertions unwarranted by the
proof and intended to arouse hatred or prejudice against
a litigant or the witnesses, are condemned as tending to
cause a miscarriage of justice. Our Supreme Court in
Evans v. Trenton, supra, dwelt on the necessity of con-
fining the remarks and arguments of the counsel in a
case to a discussion of the facts in proof, and the duty of
the trial court to restrain abuses of the right of argu-
ment. In its opinion the court indorsed the words of the
Supreme Court of North Carolina, that no other duty
incumbent on the trial court is more important to the
fair and orderly administration of justice, than that of
restraining everything in the course of the trial which
tends to mislead the jury. Several of the remarks made
by plaintiff's counsel in the present case were highly rep-
rehensible and of very prejudicial character, and not all
of them were condemned by the court. The assertion
that the history of litigation, as shown by the papers, is
that the employees of railroad corporations are com-
pelled to color the truth was egregiously improper. An
objection to this utterance was raised promptly by de-
fendant's counsel, but all the court said to plaintiff's at-
torney was to confine himself to the evidence. To this
mild reproof the attorney replied he was not going out-
side the evidence; that the court in a case of his had said
he was entitled to draw such conclusions as he was draw-
ing. We have been referred to no reported case announc-
ing such a doctrine; and beyond doubt there was no evi-
dence introduced to justify the assertion. It was an
unwarranted attempt to excite aversion in the jury
against defendant and the testimony of its employees.
The attorney persisted in his statement after the court

had forbidden him to go outside the evidence, and practically reiterated it without further reproof.    Other statements were made of an improper character, some of which were lightly censured and others not at all.    The record shows contemptuous and insulting remarks about defendant and its witnesses were freely made by plaintiff's attorneys.    But for the extraordinary character of the verdict we might not interfere with the judgment on account of these improprieties.    We think a verdict for plaintiff for one dollar actual damages, demonstrates the jury must have disbelieved his story in the main; because if his account of his treatment and sufferings is true, he was entitled to substantial damages. These were not given in a compensatory form, but punitive damages to the amount of one thousand dollars were given; and in this state such verdicts have been upheld, though in many jurisdictions an award of nominal damages will not support an assessment of exemplary.    [Mills v. Taylor, 85 Mo. App. 111; Ferguson v. Publishing Co., 72 Mo. App. 462.]    We are impressed with the belief that passion and prejudice were unduly aroused against defendant by the remarks of plaintiff's counsel during the course of the trial, and that the resentment thus excited was not allayed by what the court said, but told heavily in the assessment of the punitive damages.    This being true, it is our duty to reverse the judgment in order that there may be a fair trial of the issues and, if they are found in favor of plaintiff, that an impartial award of damages may be made.    We are supported in this ruling, we think by the following authorities, besides the cases already cited.    [1 Thompson, Trials, ch. XXX, on "Abuses of the Right of Argument;" Williams v. Railroad, 123 Mo. 573, 586, 27 S. W. 838; Rice v. Sally, 176 Mo. 107, 146, 75 S. W. 398; Smith v. Tel. Co., 53 Mo. App. 26; Ensor v. Smith, 57 Mo. App. 584; Fatham v. Tumility, 34 Mo. App. 236; Killoren v. Dunn, 68 Mo. App. 212.]

The judgment is reversed and the cause remanded. All concur.