W. G. PETTY, Respondent, v. ST. LOUIS & SAN FRANCISCO RAILROAD COMPANY, Appellant.

Springfield Court of Appeals, July 7, 1910.

1. **CARRIERS OF PASSENGERS: Refusal to Pay Fare: Ejecting Passenger Near Dwelling House.** Plaintiff was ejected from a railroad train for failure to pay his fare. He was made to get off at a point where, from his own testimony, it appeared a dwelling house was across the field and was so near it could be seen in the dark. *Held*, that under a reasonable construction of the statute (section 1074, Revised Statutes 1899), plaintiff was ejected at a proper place and he could not recover.

2. ———: ———: ———: **Construction of Statute.** A fair construction of the statute (section 1074, Revised Statutes 1899), means that the dwelling house must be so near that the ejected person can conveniently find his way thereto. The purpose of the statute is to deny the right of the railroad company to eject the passenger at a place where it might be dangerous on account of the inability of the ejected person to secure shelter, or where he might be exposed to other dangers.

3. ———: ———: ———: **Burden of Proof.** The burden of proof is on the railroad company to prove the contingency on which the right of expulsion of the passenger existed.

4. ———: **Pass for Continuous Trip: Stop Over Privilege Denied.** Where a "drover's pass" signed by the shipper entitled the shipper to a continuous passage from one station to another, he was not entitled to break the trip and subsequently complete it on a later train.

Appeal from Dunklin Circuit Court.—*Hon. J. L. Fort,* Judge.

REVERSED.

*W. F. Evans* and *Jas. Orchard* for appellant.

(1) When a pass specifies that it must be a continuous trip, then the passenger must remain on the train on which they start until they arrive at their destination; the holder of such ticket is not, after the beginning of the journey, entitled to stop off at any intermediate point and subsequently resume the journey. Walker v. Railroad, 15 Mo. App. 333; Kellett v. Railroad, 22 Mo. App. 356; 6 Cyc. Law and Procedure, 583; 4 Elliott on Railroads, sec. 1595; Boling v. Railroad, 189 Mo. 219; Cherry v. Railroad, 191 Mo. 489; Cherry v. Railroad, 52 Mo. App. 499; Sommerfield v. Transit Co., 108 Mo. App. 718. (2) The servants of the company had the right to put the plaintiff in this case off at any point where it would not expose him to serious danger, or result in undue injury to him. Wyman v. Railroad, 34 Minn. 210; McClure v. Railroad, 34 Md. 532; Railroad v. Miller, 19 Mich. 305; Bryan v. Railroad, 15 Gray 20.

*W. S. C. Walker* for respondent.

GRAY, J.—This cause was tried in the circuit court of Dunklin county on the 15th day of November, 1906, resulting in a judgment in favor of the plaintiff for one hundred dollars and the cause is here on defendant's appeal.

The plaintiff, in December, 1905, shipped some stock from Kennett, Mo., to East St. Louis, Ill. He accompanied the stock and on the 20th or 21st day of December, sold the same and received what is known as a "Drover's Pass" for his return trip. This pass specified that it was good for one continuous trip from St. Louis, Mo., to Kennett, Mo., over the defendant's

railroad. The plaintiff boarded the train of the defendant at St. Louis, and started on his homeward journey. In going from St. Louis to Kennett, it was necessary to go to Hayti, and there change cars for Kennett. Before arriving at Hayti, plaintiff left the train at Sikeston, on the morning of December 22d, and went from there to Cairo, Ill., where he met his daughter and started home from that point next day. On the morning of the 23d, he again got on the train at Sikeston. When the collector came to collect the tickets, he refused to honor the "Drover's Pass" held by the plaintiff, for the reason that it provided for one continuous trip, and that it had been punched by the conductor on the train that plaintiff had rode on from St. Louis on the night of the 21st and morning of the 22d, and demanded that plaintiff pay his fare, and informed him if he did not, he would be removed from the train. The plaintiff refused to pay, and the conductor then told him that the train would stop at a water tank, and when it did, for him to get off. When the train stopped at the tank the plaintiff did not get off and when the conductor found him on the train, he stopped the train and plaintiff was removed.

The petition originally was in two counts. The first count alleged that the pass was valid and that the conductor wrongfully and forcibly ejected plaintiff from the train. The second count did not allege that the ticket was valid, but charged that the plaintiff was put off the train at a point which was not the usual stopping place for said train, and not near any dwelling house; that the time of such ejection was an early hour of the morning when it was not light, and when it was dangerous for the plaintiff to attempt to reach any dwelling house; that the weather was disagreeable and the plaintiff was forced to walk four miles to the nearest station, and that the acts complained of were in violation of section 1074 of the Revised Statutes of 1899, and alleged damages in the sum of $1000.

The court sustained the demurrer to the evidence to the first count, and the cause was submitted solely on the issue that plaintiff was put off at an improper place. The testimony shows plaintiff was not ejected at a usual stopping place, and the remaining question is: Was he put off at a point not near a dwelling house? The plaintiff testified as follows:

"Q. There was no dwelling house near? A. No, sir; if there was, I never saw it.

"Q. What was the nearest dwelling house you saw? A. It was west across a field, the nearest one I saw— it was some distance—I don't know who lived there.

"Q. That was some distance from the railroad track? A. Yes, sir; across a field."

On cross-examination he testified as follows:

"Q. Did you see a farm house across the field west from the railroad? A. Yes, sir; I suppose it was a farm house.

"Q. You never paid any attention to see whether or not there was any other there? A. No, sir.

"Q. The fact is, when you was put off, you started on towards Lilbourn? A. Yes, sir; that is about all there is to it."

Re-direct examination:

"Q. Now, there was no dwelling house near where you was put off, was there? A. If there was, I never saw it."

In behalf of the defendant, W. S. Patterson, who was a collector on the train, testified as follows:

"Q. I will ask you if there was any dwelling house there? A. One on each side not over 200 yards from the water tank."

On cross-examination he testified as follows:

"Q. Who lived in those houses about 200 yards from the water tank? A. I don't know.

"Q. One on each side? A. Yes, sir; one north and one south of the track.

"Q.  Is there anything to obscure the sight of either one of those houses from the water tank?  A.  No, sir.

"Q.  Was they set out in a field, or was they in a yard?  A.  There was yards around them.

"Q.  They are farmers' houses, are they?  A.  Yes, sir.

"Q.  And a field around them?  A.  Yes, sir.

"Q.  What size houses are they?  A.  About two or three or four rooms.

"Q.  How do you know they was dwelling houses? A.  There was smoke coming out of them.

"Q.  You don't know whether or not any one was dwelling in them at the time?  A.  No, sir."

A Mr. Gibson, a brakeman on the train, on direct examination, testified as follows:

"Q.  I will ask you if there are any farm houses near the tank where he was put off?  A.  Yes, sir.

"Q.  What direction?  A.  One on the east side and one on the west side.

"Q.  About how far?  A.  On the west side not over two hundred yards, but on the east side, I think probably a little farther."

On cross-examination:

"Q.  Now, these farm houses, you don't know whether or not anybody was living there in 1905?  A. No, sir.

"Q.  You don't know whether or not they was dwelling houses, do you?  A.  Yes, sir.

"Q.  They wasn't dwelling houses, unless somebody was dwelling in them, was they?  A.  I don't see why they should not be.

"Q.  How did they look?  A.  Like any ordinary farm houses in southeast Missouri."

In rebuttal, the plaintiff testified:

"Q.  Now state, if there was, in fact, a dwelling house within two hundred yards of that track where you was put off?  A.  If there was, I couldn't see it.  The nearest house I discovered was some distance west, I am almost positive there was none east.

"Q.  How far was that one west of the track?  A. I couldn't hardly tell the distance."

There was a conflict in the testimony as to where the plaintiff was ejected from the train.  The defend- ant's testimony shows it was at the water tank, and the plaintiff's testimony, at some distance from the tank. The evidence shows it was early in the morning while it was somewhat dark.  The plaintiff testifies when he did look he saw a farm house across the field from the track.

The purpose of the statute is to deny the right of the railroad agents to eject a passenger at a place where it might be dangerous on account of inability of the ejected person to secure shelter, or where he might be exposed to other dangers.  And it has been held that the burden is on the company to prove the contingency on which the right of expulsion existed.  [Holt v. Railroad, 87 Mo. App. 203.]

In determining the question whether the plaintiff was ejected near a dwelling house, the testimony of de- fendant's agents must be excluded, as they testified he was put off at the water tank, while he denies this, and says he was put off at another point, and therefore, the question was for the jury.

When we take his testimony, he admits that he did see a dwelling house across the field, and the house was near enough so that he could see it, notwithstanding it was dark.  The trains run through the country and there may be points on the railroad where it would be a long distance to some dwelling house where the ejected per- son could find shelter, and realizing this fact, the statute was enacted that passengers refusing to pay

should be ejected either at some usual stopping place or near some dwelling house. It does not mean that the dwelling house must be as close to the track as the ordinary depot. A fair construction of the statute means that the dwelling house must be so near that the ejected person can conveniently find his way thereto.

In this case the plaintiff admits that the dwelling house was situated just across the field, and when he looked, was in view from the railroad track. When we consider the fact that the statute is limiting the right of the railroad company to eject a person who has no right on the train, it seems to us that it should have a liberal construction, and should not be so construed as to require the company to carry the passenger until he can be removed immediately adjacent to some dwelling house.

The plaintiff had no right to be carried on the train by reason of the fact that he was possessed of the "Drover's Pass." That pass was signed by him and he was supposed to know its contents, and it plainly provided that it was good only for continuous train passage. [Randolph v. Railroad, 129 Mo. App. 1, 107 S. W. 1029; Beck v. Railroad, 129 Mo. App. 7, 108 S. W. 132; Boling v. Railroad, 189 Mo. 219, 88 S. W. 35.]

The evidence shows that when the conductor informed him that the ticket was not good, that he refused to pay his fare, notwithstanding he had the money; that he was then informed that he would have to leave the train at the water tank; that at the water tank were two farm houses within two hundred yards of the track; that he did not get off the train at the water tank, but when the train started the conductor found him still on, and when the train was stopped he was put off at a point where he could see a dwelling house across the field.

When all these things are considered, we are of the opinion that the evidence shows that the plaintiff was rightfully put off the train and at a point where the de-

fendant's servants had the right to eject him, and that the trial court erred in submitting the case to the jury.

We will therefore reverse the judgment. All concur.