## NANNIE C. POWELL v. ST. LOUIS & SAN FRANCISCO RAILROAD COMPANY, Appellant.

### In Banc, June 21, 1910.

1. **PASSENGER: Tender of Fare: Ejection.** A passenger who tenders his fare before the train has been stopped and before the train employees undertake to eject him, cannot thereafter be lawfully ejected for failure to pay fare promptly when it was demanded; and the evidence in this case is held sufficient to submit to the jury the issue of whether such tender was so made.

2. ————: Definition: Evidence. A passenger is one who enters the vehicle of a common carrier with the intention of paying in money the usual fare for his transportation, or who is supplied with a ticket or pass entitling him to ride to a given point; and where one of the issues is whether or not he was a passenger, testimony tendered by defendant tending to indicate he was not, or explaining the situation, should be admitted.

   *Held*, by VALLIANT, J., that the word "passenger" as used in Sec. 1074, R. S. 1899, declaring that any passenger refusing to pay his fare or behaving in an offensive way may be put off "at any usual stopping place or near any dwelling house," does not necessarily mean a person entering the car with the intention of paying his fare, but is used in a restricted sense, and means a person who has entered the car, or is in the car, for the purpose of being carried.

3. ————: Intention: Competent Testimony. When the question at issue is one involving intent, testimony of the party's acts and conduct of a kindred character is competent to illustrate or establish his intention in the particular act. Where one of the issues is whether or not plaintiff's husband was a passenger

on the train from which he was ejected, testimony of his conduct in entering another train shortly prior thereto and closely connected therewith is competent as bearing on his intention in entering the train from which he was ejected. [GANTT, VALLIANT and WOODSON, JJ., dissenting.]

4. ———: Carried Beyond Destination: Return: Ejection: Subsequent Injury. Plaintiff's husband was ejected from an eastbound train near Pacific about 9:30 o'clock at night, and in walking on the track back towards Pacific was struck by a westbound train and killed, and she sues for damages, and defendant pleaded that he was a trespasser, and claims he was not a passenger and that he was properly ejected for failure to pay fare. There was testimony on the part of plaintiff that he was a passenger, and testimony on the part of plaintiff and defendant that he tendered his fare before the train was stopped for his ejection. *Held*, that the court erred in refusing to permit defendant to show that plaintiff's husband boarded one of defendant's trains at Union Station which left St. Louis at 8:21 the evening of the accident; that when he boarded the train the porter inquired of him where he was going and he answered, Springfield; that the porter knew he was a constant traveler on the road to Springfield and points beyond; that after he had boarded the train and taken his seat, a train collector requested his fare; that he had purchased a commutation ticket entitling him to ride on the trains between St. Louis and Eureka, and tendered this ticket to the collector, stating he desired to disembark at Eureka; that Eureka was a station on the road between St. Louis and Pacific; that the collector stated to him that the train did not stop at Eureka and he could not carry him to Eureka; that he refused to pay other fare, and paid none whatever; that the conductor did not stop the train and eject him because it was so closely followed by another through train that it would have been dangerous to have stopped at any point before reaching Pacific; and that when the train reached Pacific he left it. That evidence was competent as showing his good faith and intention of becoming a passenger, and therefore as bearing on the issue of whether or not he was a passenger, on the east-bound train which he almost immediately boarded at Pacific, and to whose conductor he declared he was going into St. Louis, and tendered the commutation ticket from Eureka to St. Louis, and to whom he at first refused to pay fare from Pacific to Eureka, and disputed about the amount and was ejected.

*Held*, by GANTT, J., dissenting, that the proffered testimony was immaterial; that the right of plaintiff's husband to be carried from Pacific to Eureka and the right of the conductor to expel him did not in anywise depend upon his

wrong in deceiving the porter of the other train or upon his being in the wrong while on that train.

5. ———: ———: ———: Invited by Plaintiff: Right to Object. Where counsel for plaintiff, in the cross-examination of plaintiff's conductor, sought to show that plaintiff's husband often traveled on defendant's trains and habitually paid his fare, he thereby raised the issue of her husband's intention to pay his fare when he entered the train from which he was ejected, and thereafter was in no position to object to defendant's showing that plaintiff's husband knew the train on which he left St. Louis did not usually stop at Eureka, that he then announced to the porter that he was going to Springfield, that he exhibited a commutation ticket to Eureka, that he was carried to Pacific without paying any fare, and almost immediately took an east-bound train back to Eureka and at first refused to pay his fare to Eureka—all as bearing on his intention of becoming a passenger on entering the train at Pacific.

6. ———: Expulsion: Subsequent Injury: Proximate Cause. Under the statute the expulsion of a passenger from a train at any other place than at some usual stopping place, or near a dwelling house, is unlawful. And where the expulsion was at some other place, the demands of the law are satisfied if the passenger's subsequent killing by a train as he walked along the track towards the station was the natural, though not the necessary or inevitable, result of the wrongful expulsion. And where the passenger, unacquainted with the surroundings, was expelled at least a half mile from the station, at a place near which there was no dwelling house, and the expulsion was in the night time, at a place where there were no lights, and on one side of the track twenty-five feet away was another railroad on which a train soon passed, and on the other side was a river, and a steep embankment led down from the track on both sides, and while walking on the track back to the nearest station he was struck from behind by a freight train of which he did not know, it is not necessary that his injury should have been foreseen by the conductor, or that his wrongful expulsion should have been the immediate cause thereof, but it is sufficient if the injury was a natural consequence thereof under the circumstances. (Per GANTT, J.)

7. ———: ———: ———: Contributory Negligence: Question for Jury. When a passenger is wrongfully ejected from a train in a place of danger, he is bound to use prudence and judgment to extricate himself, but only the care of an ordinarily prudent and careful man. And where he was a stranger, the night was dark, there was a ditch on both sides of the track, it was located on an embankment eight or nine feet high, and beyond the

ditch on one side were a fence and a river, and on the other another railroad, and on that railroad was moving a long, noisy train, and it could not have been more than four seconds after the train from behind rounded the curve before he was struck, and he did not know of that train, it was for the jury to decide whether he was guilty of contributory negligence in walking on the track back to the station. (Per GANTT, J.)

Appeal from St. Louis City Circuit Court.—*Hon. Daniel D. Fisher*, Judge.

REVERSED AND REMANDED.

*W. F. Evans* and *Jones, Jones, Hocker & Davis* for appellant.

(1) The plaintiff's deceased husband was guilty of such contributory negligence that as a matter of law the court should have instructed the jury to find for the defendant. The evidence shows that the deceased was walking along the railroad tracks without looking or listening for the approach of the train thereon, and failed to heed the warning repeatedly given him by the operatives of the train. Brocksmith v. Railroad, 205 Mo. 444; Statler v. Railroad, 204 Mo. 636; Schmidt v. Railroad, 191 Mo. 228; Porter v. Railroad, 199 Mo. 97; Sinclair v. Railroad, 133 Mo. 241; Zumault v. Railroad, 170 Mo. 312; Hayden v. Railroad, 124 Mo. 566; Sanguinette v. Railroad, 196 Mo. 466; Peterson v. Railroad, 156 Mo. 560; Bell v. Railroad, 86 Mo. 612; Degel v. Railroad, 101 Mo. App. 59; Holmerson v. Railroad, 157 Mo. 225; Railroad v. Moseley, 57 Fed. 921; Tanner v. Railroad, 161 Mo. 510; Sharp v. Railroad, 161 Mo. 214; Skipton v. Railroad, 82 Mo. App. 143; Zimmerman v. Railroad, 71 Mo. 476; Powell v. Railroad, 76 Mo. 80; Yancy v. Railroad, 93 Mo. 433; Barker v. Railroad, 98 Mo. 50; Moxey v. Railroad, 113 Mo. 1; Vogg v. Railroad, 138 Mo. 112; Koegel v. Railroad, 181 Mo. 379; Taylor v. Railroad, 86 Mo. 457; Ham v. Canal Co., 155 Pa. St. 553. (2) The evidence justified the

ejection; the negligence charged in ejecting the deceased was not the proximate cause of the death; and the demurrer should have been sustained for these reasons. (3) The duty of a person approaching or upon a railroad track is not to exercise ordinary care to look and listen for the approach of trains, but to actually look and listen therefor, and the defendant was entitled to a concrete instruction directed to the covering of that obligation by the deceased. Wands v. Railroad, 106 Mo. App. 99. (4) The court erred in excluding the testimony offered by the defendant with respect to the occurrences upon the train upon which the deceased rode from St. Louis to Pacific. The occurrences there were characteristic of what occurred on the inbound train, and the defendant was entitled to this testimony as an aid to the determination of the issue of fact as to the propriety or impropriety of the ejectment of the deceased, and as indicative of the attitude of the deceased at the time and under the circumstances in which he was ejected.

*J. S. McIntyre* and *X. P. Wilfley* for respondent.

(1) The conductor had no right to eject Powell from the train after he showed that he intended to become a passenger thereon, and after the conductor had accepted his ticket for a portion of the journey, and Powell had tendered him the money for the intervening distance. Holt v. Railroad, 174 Mo. 525; Gates v. Railroad, 125 Mo. App. 334; Peck v. Railroad, 129 Mo. App. 7. (2) Even if Powell had refused to pay his fare the conductor would not have been justified in putting him off at any other than a usual stopping place, or near a dwelling house. R. S. 1899, sec. 1074; 6 Ency. Pro. and Pr. p. 563; Railroad v. Johnson, 108 Ala. 62; Railroad v. Latimer, 128 Ill. 163; Sullivan v. Railroad, 81 Ky. 624; Boehn v. Railroad, 65 N. W. 506; Railroad v. Branch, 45 Ark. 524; Steph-

ens v. Smith, 29 Vt. 160; Hang v. Railroad, 42 L. R. A. 664; Arnold v. Railroad, 115 Pa. St. 135; Holt v. Railroad, 174 Mo. 525. (3) The ejection of Powell, at the time and place and under the circumstances, was the proximate cause of the injury. If a person is placed in a situation of danger, by the defendant's misconduct, and is injured while making a reasonable endeavor, and in the exercise of ordinary care, to extricate himself, such misconduct of defendant is the proximate cause of the injury. Evans v. Railroad, 11 Mo. App. 463; Rawling v. Railroad, 97 Mo. App. 512; Winkler v. Railroad, 21 Mo. App. 99; Estes v. Railroad, 110 Mo. App. 725; Phillips v. Railroad, 211 Mo. 419; Miller v. Railroad, 90 Mo. 389. (4) Whether Powell was guilty of contributory negligence, or whether he exercised ordinary care in extricating himself, after he had been left in a place of danger by defendant, is a question for the jury and was properly submitted to the jury in the instruction given by the court. Tillburg v. Railroad, 217 Pa. St. 618; Ham v. Canal Co., 155 Pa. St. 548; Railroad v. Rosenzweig, 113 Pa. St. 519; Railroad v. Hedge, 44 Neb. 448; Railroad v. Terry, 62 Tex. 380; Brown v. Railroad, 54 Minn. 342; Railroad v. Doane, 37 Am. & Eng. Cases (Ind.) 87; Railroad v. Pitzer, 109 Ind. 179; Evans v. Railroad, 11 Mo. App. 463. (5) After deceased was ejected from the train, and left on the right of way of defendant, it was a question of whether he exercised ordinary care to get to a place of safety, and that was properly submitted to the jury in the instructions given. Railroad v. Cooper, 120 Ind. 469; Ham v. Canal Co., 155 Pa. St. 548; Tilburg v. Railroad, 217 Pa. St. 624; Jones v. Boyce, 1 Starkie 493; Malone v. Railroad, 152 Pa. St. 390; Railroad v. Hedge, 44 Neb. 448.

FOX, C. J.—This cause is pending in this court upon appeal by the defendant railroad company from a judgment of the circuit court of the city of St. Louis

in favor of the plaintiff in the sum of five thousand dollars.

This is an action to recover damages for the death of plaintiff's husband, W. B. Powell, which occurred at Pacific, Missouri, on July 23, 1905, as a result of being struck by a passenger train operated by the defendant. At the time of the death of plaintiff's husband he resided with his wife in the city of St. Louis. Pacific is situated 36 miles southeast of St. Louis, and both the defendant railway company and the Missouri Pacific Railway Company pass through the town of Pacific. Plaintiff's husband was struck by the west-bound train of the defendant near where Elm street joins the defendant's tracks in Pacific, while he was walking between the main tracks of defendant in a westerly direction with his back to the engine that struck him.

The petition of the plaintiff embraced three counts, but at the close of the plaintiff's case the circuit court held that the evidence was insufficient to justify the submission of the cause to the jury upon either the second or third counts; hence the cause, when all the evidence was heard, was submitted to the jury upon the first count alone. This count in substance alleges that plaintiff was the widow of William B. Powell, and that the defendant was at all times mentioned, and is now, a railroad corporation doing business as a common carrier in and by virtue of the laws of this State, and operating a steam railroad from the city of St. Louis to and through the town of Pacific, in the county of Franklin; that on the 23d day of July, 1905, defendant received her husband at the town of Pacific as a passenger upon one of its trains, and for a valuable consideration, then and there paid by the said William B. Powell to defendant, agreed to carry him safely to the city of St. Louis; that shortly after said William B. Powell had become a passenger on said train of defendant, the conductor in charge of said train came to said Powell and asked him for his fare; that said Powell tendered

said conductor a railroad ticket issued by defendant, the destination of which was St. Louis, which ticket the defendant's conductor received and accepted, and after having accepted the same, then demanded of said William B. Powell further compensation as passenger on said train, which compensation the said Powell offered and agreed to pay and actually tendered to said conductor in good and lawful money; that said conductor refused to accept said sum of money so demanded by him and tendered to him by the said Powell, but then and there ordered said Powell to get off of the said train; that said Powell again offered to pay and again tendered said conductor said sum of money as additional fare for conveying and carrying him as a passenger from Pacific to St. Louis. That thereupon said conductor summoned other employees of the defendant, members of the train crew in charge of said train, and the said agents and servants of defendant with force and violence willfully and wrongfully ejected said William B. Powell from said train. And plaintiff avers that by reason thereof and as a direct result of such wrongful ejectment said William B. Powell was left by the defendant on its right of way and in a place of great danger, a great distance from the town of Pacific or any other station or usual stopping place, and a great distance from any dwelling house or light or platform, and that the time of such ejectment was 9:30 o'clock at night; that it was very dark at said place where said Powell was ejected, and there was a steep incline and ditch on either side of the railroad tracks of defendant and there was no house or light near said place to give the said Powell information whereby he might find a place of safety; that while her said husband was in the exercise of ordinary care in attempting to extricate himself from said place of danger and reach a place of safety, and while at and near said place of ejectment, and shortly thereafter, one of defendant's trains, in charge of the em-

ployees of the defendant, struck said William B. Powell with such great force and violence, while running at a rapid rate of speed, as to throw him against the ground with such force and violence as to inflict mortal injuries from which said husband died shortly thereafter, without any fault or negligence on his part. Plaintiff averred her damages to be the sum of ten thousand dollars.

The answer was a general denial, and for a further defense the defendant admitted that it was then, and was at all times in said first count mentioned. a railroad corporation doing business as a common carrier in and by virtue of the laws of this State; that on or about the 23d of July, 1905, said William B. Powell received injuries which resulted in his death, but the defendant denies that such injuries or any of them and the death of said deceased were caused by or resulted from any carelessness, negligence or wrongful act, omission or default of the defendant or any of its agents, servants and employees, but, on the other hand, avers the said death of the deceased was caused by his own carelessness and negligence; that at the time he received his said injuries and death he was negligently and unlawfully walking and trespassing upon the railroad roadbed and property of the defendant and negligently and carelessly failed to look or listen for approaching trains and cars and negligently failed to avoid being struck or injured by any train upon said railroad, by reason of which negligence and unlawful conduct, he received said injuries from which his death resulted.

The testimony developed upon the trial of this cause as disclosed by the record is quite voluminous and we do not deem it essential to reproduce it in detail. It will suffice for the purpose of enabling us to determine the legal propositions, to briefly indicate the facts which the testimony tends to establish.

The record discloses that plaintiff's husband, William B. Powell, on the evening of the accident, took passage on one of defendant's trains leaving Union Station at 8:21 and remained upon said train until it reached Pacific, where he alighted and at about 9:30 p. m., which obviously was only a few minutes after he alighted from the other train going west, boarded an east-bound train of the defendant railway company and took a seat in a coach about the third seat from the door on the right side of the car. The testimony tends to show that shortly after the train pulled out of Pacific the conductor approached Mr. Powell; upon the conductor first calling for a ticket or fare Mr. Powell paid no attention to him; then followed a controversy between the deceased Powell and the conductor with reference to the transportation. Finally Powell gave the conductor a ticket from Eureka, a station further east of defendant's line, to Tower Grove, a station inside the city limits of St. Louis, which ticket the conductor accepted, but told Mr. Powell that he would have to pay his fare in money for the intervening distance from Pacific to Eureka; the conductor told Mr. Powell that the fare from Pacific to Eureka was 28 cents. Then followed a dispute about that—Mr. Powell contending that the fare was less—that it was only 16 cents. Powell still refusing to pay his fare the conductor informed him that he was going to put him off the train and summoned some of his crew to assist him, and he was, at a point somewhere near the Frisco pump station, removed from said train. There was evidence on the part of the plaintiff that Powell, after realizing that the conductor was going to put him off the train and had summoned some of his crew to assist him, tendered the conductor fifty cents out of which to take the fare, before the conductor undertook to eject him.

The record discloses a sufficient amount of testimony tending to establish the fact in dispute, that the

plaintiff's husband boarded the train with the intention of becoming a passenger and tendered the conductor the amount of his fare, to authorize the submission of this question to the jury. On the other hand the testimony on the part of the defendant tends to show that no tender was made of the fare which the conductor had the right to collect. The conductor positively denies that such a tender was made; however, on cross-examination, he testified that he heard a half dollar drop on the platform while he and other members of the train crew were putting Powell off the train; as to what party dropped the half dollar or to whom it belonged he did not know. The conductor also testified that he accepted the ticket from Eureka to Tower Grove and turned it in with his report of the day, and that he agreed to take Powell on to Tower Grove if he would pay twenty-eight cents for his passage from Pacific to Eureka; but the conductor further testified that, upon the refusal of Mr. Powell to pay his fare from Pacific to Eureka, in accordance with the rules, he made up his mind to put him off the train and that he tendered Powell back the ticket that he had taken up from him from Eureka to Tower Grove, but that Mr. Powell did not accept it. The conductor testified that when he approached plaintiff's husband to collect fare Powell not only refused to pay fare, but stated to him that he had brought him out to Pacific and that he would have to take him back. The record also discloses that counsel for plaintiff, upon cross-examination of the engineer, sought to show that Mr. Powell was in the habit of traveling upon the trains of the defendant and that in traveling upon such trains he would pay his fare. In this cross-examination counsel for plaintiff made the following inquiries and received answers thereto: "Q. Had he ever been a passenger on your train before? A. Yes, sir. Q. How often? A. Twice. Q. Do you remember when that was? A. On the 4th day of July was once. Q. The 4th day of what

July? A. 1905. Q. Well, when was the other time? A. I don't remember the other time. Q. Where were you going when he was a passenger on the 4th of July? A. Pacific, Missouri. Q. From where? A. St. Louis. Q. Did he pay his fare that day? A. He paid it a part of the way and tried to beat me the rest. Q. Did you collect it for the rest of the way? A. Yes, sir. Q. How far did he pay? A. Paid from Valley Park to Mincke. Q. Did you have a controversy with him that day? A. Yes, sir. Q. Did you threaten to put him off that time? A. No, sir.''

James Starks, a Frisco train porter, was offered as a witness by the defendant and upon the court sustaining an objection to his testimony which was being sought by the defendant, counsel for defendant made the following tender of proof by this witness: ''The defendant expects to show by this witness that W. B. Powell, plaintiff's deceased husband, on the evening of July 23, 1905, boarded train No. 5, which left St. Louis Union Station at 8:21, and that when he boarded this train, the witness upon the stand, who was a porter on that train, inquired of Mr. Powell where he was going and Powell answered, 'Springfield, Missouri;' that this porter knew that Powell was a constant traveler on the Frisco line to Springfield and other points beyond Springfield; that after Powell had boarded the train and taken his seat a train collector came through the train and requested the fare of Mr. Powell; that Mr. Powell purchased a commutation ticket entitling him to ride on trains running between St. Louis, Missouri, and Eureka, Missouri, and tendered this commutation ticket as fare, stating that he desired to disembark from the train at Eureka; that the collector, who was authorized to collect tickets, stated to Powell that the train did not stop at Eureka and that he could not carry him to Eureka; that Powell refused to pay other fare; that this train No. 5 was fol-

lowed out of St. Louis within the next 20 minutes by train No. 7, which was also a fast train, and that the conductor did not stop the train and remove Powell therefrom because of the close proximity of the running time of the two trains upon the same track, it being dangerous to do so, but carried Powell to Pacific, Missouri, and did not accept any fare from Powell, and that when the train reached Pacific, Missouri, Powell left the train.''

R. E. Core, a train collector, was offered as a witness by the defendant and the court again sustained objection to his testimony, and the offer and tender to make the same proof as by witness James Starks was made. This offer of proof by the two witnesses named was rejected by the court, whereupon counsel for defendant duly preserved its exceptions to the action of the court in excluding the offer.

The evidence as disclosed by the record as to the exact point at which plaintiff's husband was removed from the train, as well as the nature and character of the barrow pits and ditches on the sides of the track from the point of removal to the place of the accident, is very much in conflict. According to some of the witnesses the place where plaintiff's husband was ejected from the train was east of what is known as the Frisco pump house, about a half mile from the station house at Pacific, and outside of the city limits of Pacific. Other witnesses located the point near the Frisco pump house, which would make the distance less than a half mile from the station house at Pacific, and others locate it west of the Frisco pump house, expressing the opinion that the distance from the point of removal to Pacific was only about one quarter of a mile.

Upon the question as to the condition of the sides of the tracks from the point where plaintiff's husband was removed from the train to where the accident occurred at Elm street, the disclosures of the record are very unsatisfactory. The plat as introduced in evi-

dence indicates or shows that on the north side of the track near the Frisco pump house there was a ditch 8 and 8-10 feet below the track. Toward Pacific from the pump house, following the track west as you approach Pacific from the pump house, the ditches or barrow pits on either side of the track grow more shallow. At a point about midway between the pump house and where the accident occurred on Elm street the plat indicates a ditch on the north side of 2 and 3-10 feet below the track, and on the south side a barrow pit 3 and 2-10 feet below the track, and about two-thirds of the way from the Frisco pump house to Elm street where the accident occurred, the plat shows on the south side of the track a barrow pit 2 and 6-10 feet below the track, and on the north side doesn't show any ditch or pit whatever. At the place where the accident occurred the plat indicates on the south side of the track a barrow pit 5 and 6-10 feet below the track; on the north side there was a space between the north rail of the defendant's track upon which plaintiff's husband was walking, and the south rail of the transfer track, of 9 and 6-10 feet. On the north side of the space of 9 and 6-10 feet between the Frisco track upon which the plaintiff's husband was walking and what was called the transfer track, and also north of the transfer track, there were five or six other tracks.

The record further discloses that 25 or 30 feet north of the Frisco tracks near the point where this accident occurred, there was an engine or train on the Missouri Pacific track, that is, there was a freight train going west with a pusher engine behind it. This engine was pushing the freight train on the Missouri Pacific tracks west. The fireman on the Frisco engine at the time of this accident testified substantially that before the engine reached Mr. Powell he observed on the Missouri Pacific track the pusher engine pushing the freight train as above stated. Inquiry was made of this fireman as to whether this engine on the Missouri

Pacific was making a noise; his answer was "an ordinary noise; just the ordinary noise like any other engine would make." Inquiry was made as to whether or not the engine was making the noise those engines make when they are pushing a train, that is, a heavy noise; he replied to that question, "Just the exhaust, that is all." The inquiry was then made as to whether the exhaust noise was not a considerable noise, and his reply to that was, "Well, it is not a very loud noise; just an ordinary noise." This fireman further testified that the engineer on the Missouri Pacific engine blew the whistle two or three times; he also said that he heard the bell on the Missouri Pacific engine ringing; stated further that Mr. Powell, plaintiff's husband, apparently had his head turned toward the Missouri Pacific train.

The civil engineer, Mr. Skelly, who made the plat for plaintiff, testified that between the north rail of the Frisco and the south rail of the transfer track there was a distance, as heretofore indicated, of 9 and 6-10 feet. He also testified that from the end of the ditch as indicated on the map, which is about midway between the Frisco pump house, near where plaintiff's husband was removed from the train, and Elm street where the accident occurred, on the north side of the Frisco track to a point only a few feet east of Elm street, was good walking; that the only obstruction on the north side of the Frisco track was the tracks heretofore spoken of, and the nearest track to the Frisco on the north side was a distance of 9 and 6-10 feet away; this furnished ample and sufficient distance to enable a person to walk from the end of the ditch, about midway between the pump house and the place of the accident, to the point of the accident and be clear of trains on the tracks of the Frisco or upon the tracks north of the Frisco. This witness further testifying stated that the depression on the south side of the track, which was termed by one of the counsel for plain-

tiff "a ditch," was simply the result of building up the roadbed; in other words, that it was largely a barrow pit. Inquiry was then made of the witness as to what a barrow pit was. His answer to that was that it was "a ditch excavated in order to obtain material for the embankment." He also stated that the railroad right of way, after you leave the embankment, is substantially level; in other words, he says that upon leaving the embankment and reaching the bottom of the barrow pit, it is then level with the contiguous land south and practically level with the yards of two little houses situate near there. In seeking an explanation of what this depression of the ground amounted to, this question was asked: "Q. So whatever depression there is, is simply the depression from the top of the embankment where the tracks are; there is a gradual slope down to the level of the ground and then the ground is level, isn't it? A. Practically level."

Witness D. S. Campbell, who was the train conductor for the Missouri Pacific, testified that he saw Mr. Powell walking on the Frisco track; that he was covered by the electric light from the engine that struck him; that he heard the whistle of the engine. He says at first that the engineer whistled as if he was going to whistle for the station, but he finally came to giving danger signals and that is what first attracted his attention, but he says that he saw Powell a little bit before the whistle blew. This witness then proceeds in his testimony to explain that as the Frisco train came around the curve the headlight fell on the Missouri Pacific engine and then swung over to the south, and "when the headlight swung around on the Frisco main track and when the light came straight upon the track I saw some man on the track." In answer to an inquiry this witness substantially stated that he did not know whether he saw the electric light when it first "lined up" upon the Frisco track or not, but in substance stated that he did know that when he looked

over there he saw this man walking on the track and about that time he heard the danger signal given. In answer to the question as to how far away was this train from the man when he first saw him, he says: "I can't say how far it was away from him; it is pretty hard to tell by looking at an electric light how far it is away; I should judge two or three hundred feet or more." He further testified that he heard the danger signals distinctly; that they consisted of sharp blasts of the whistle and that Mr. Powell walking along on the track didn't pay any attention to either the electric light that was then over him or the sharp blasts of the whistle. This witness in substance further testified that the track was right smooth and clear on the north side and that there was nothing to prevent Mr. Powell from stepping off the track there. In the opinion of this witness there was plenty of good walking between the Missouri Pacific track and where Powell was standing or walking on the Frisco track. He also stated that Mr. Powell was on the Frisco track going toward the depot west; that he was standing erect, so far as he knew, and was walking along as any man would walk along and that he did not notice anything peculiar about him.

The engineer operating the engine that struck Mr. Powell testified that his engine came around the curve and was within 75 or 125 feet of Powell before he saw him, and that the engine was running at a rate of 35 miles an hour, and that he used every effort with the appliances he had at hand to check the train before striking Mr. Powell; that he sounded the signal blasts and whistled continuously with the view of attracting his attention, but that he seemed to pay no attention either to the electric light covering him from the engine approaching him from behind or the continuous blowing of the whistle.

John Raby, who was the city marshal at Pacific, was introduced as a witness for the plaintiff. His tes-

timony tends to show that he was familiar with the condition of the ground on each side of the Frisco track at and near the point of this accident. This witness explained how far the electric light on the engine on the Frisco track would extend in front of the engine, and the effect of his testimony is that the electric light on the engine that struck Mr. Powell covered him for a number of feet before the engine ever reached him. This witness also testified that he heard the danger signal blasts of the whistle that were sounded by the Frisco engine on the evening of this accident. The following questions were propounded to this witness concerning the subject of a dwelling house and the facilities for walking along on the sides of the railroad track:

"Q. If a man were to get off of a train on the Frisco railroad near either one of the pump stations, he would be near a dwelling house, would he not? A. Yes, sir.

"Q. What is the last house in Pacific, immediately adjacent to the Frisco right of way; is there any house below Kennedy's house? A. Yes, sir; John Lewis's house is the last one.

"Q. How far is it, then, from John Lewis's to the Runyan house? A. One-fourth of a mile.

"Q. There is not any point between the depot in the city of Pacific and the Runyan house where a man could be put off the Frisco Railroad without being at least one-eighth of a mile of a dwelling house, is there? A. No, sir.

"Q. Mr. Raby, if a man were to get off a train down near either of the pump stations, by following the path that you mentioned in your evidence could he not reach the city of Pacific without walking on the main track of either of the railroads? A. Yes, sir.

"Q. And he would be out of danger, would he not? A. Everywhere except on the culvert.

"Q. Even at the culvert there is room enough at the side for him to walk along? A. Yes, sir.

"Q. That is the fact as to—speaking now of the property of the railroad right of way out at the place where Deighton Lewis lives—if a man were on the Frisco tracks walking west and the Frisco train were coming from the east and should sound the danger signal for the purpose of getting him to leave the tracks and seek a place of safety, what is the fact as to whether he could step off either side there without danger to himself? A. A man could step off either side there without hurting himself at all. . . .

"Q. Mr. McIntyre asked you about the depression that was between the tracks down there that you said, I believe, led up to the transfer track; now, then, you never did see that at any time when it was grown up in underbrush, did you? A. No, sir; just swamp grass.

"Q. It is no trouble for a man to walk along there? A. No, sir."

C. J. Slocum, who was the fireman on the Missouri Pacific train heretofore spoken of, on the evening of the accident, was introduced as a witness by the plaintiff. He seemed to be familiar with the condition of the ground on the sides of the Frisco railroad track and testified upon that subject as follows:

"Q. I understand you to say, at the time you heard this danger blast sounded, that you were on the left-hand or north side of the Frisco track and for that reason, among others, you did not see what was going on over there? A. Yes, sir.

"Q. Mr. Slocum, at the time that danger signal was sounded, if there had been on the track of the Frisco a man walking ahead and west of the Frisco train on the main track 150 or 200 feet west of the Frisco train, what was there to prevent that man from stepping off on either side and to a place of safety? A. There was nothing at all.

"Q. There was no bad places there—is there?
A. No, sir.

"Q. There have been some questions asked about
a depression between the two railroad tracks down
there near the pump station, can you tell us about that?
A. Down about the pump station the Frisco is built
on a fill. ·

"Q. What is the fact as to the Missouri Pacific
being built on a fill there? A. There is a depression
between the two tracks there.

"Q. That depression is not a ditch with water in
it, is it? A. No, sir.

"Q. That depression, so far as you know, never
has been grown up in underbrush? A. No, sir.

"Q. If a man wanted to step off the train tracks
of the railroad there, there would be a reasonably good
place for him to walk in that depression between the
two tracks, where he would be safe from passenger
trains? A. Yes, sir.

"Q. There is no occasion is there, Mr. Slocum,
for a man who wants to come in the vicinity of the
pump station west to Pacific to walk on the main tracks
of the railroad, either railroad, unless he voluntarily
desires to walk in that place? A. No, sir.

"Q. He can walk on one side or the other and be
safe, if he wants to? A. Yes, sir. . . . .

"Q. Mr. Slocum, is the character of the depres-
sion between the Missouri Pacific tracks and the Frisco
tracks from the pump house west, the same now as
it was on the 23d of last July? A. I think it is.

"Q. There has been no change there? A. I don't
know of any."

It is further disclosed by the testimony of the en-
gineer and fireman on the engine that struck Mr. Pow-
ell that there were some men on the Missouri Pacific
train hallooing, as they supposed, at Mr. Powell. The
record further tends to show that Mr. Powell, as the
engine approached from behind him, was walking erect,

at least seemingly so and walked along leisurely. The engineer in his testimony says "there was nothing to indicate that he could not take care of himself," and further states that he blew the whistle very rapidly and constantly from the time he discovered Mr. Powell upon the track. The testimony of the fireman as to Mr. Powell walking in the middle of the track leisurely and the blowing of the whistle rapidly and constantly before he was struck substantially corroborates the testimony of the engineer.

This sufficiently indicates the nature and character of the testimony upon which this cause was submitted to the jury. At the close of the evidence the court instructed the jury. Proper attention will be given the instructions during the course of the opinion. The cause being submitted to the jury they returned a verdict finding the issues for the plaintiff and assessing her damages at the sum of five thousand dollars. Timely motions for new trial and in arrest of judgment were filed and by the court overruled. Judgment was rendered in accordance with the verdict and from this judgment the defendant prosecuted this appeal, and the record is now before us for consideration.

## OPINION.

The record before us in this cause discloses the assignment of three grounds on the part of the appellant for the reversal of this judgment. They may be briefly stated as follows:

First: Because upon the evidence as disclosed by the record the ejectment of plaintiff's husband was justifiable.

Second: If the ejectment of plaintiff's husband was not justifiable, nevertheless it was not the proximate cause of his death.

Third: It is earnestly insisted that the plaintiff's husband was guilty of such contributory negligence as

made it the duty of the trial court to declare as a matter of law that plaintiff was not entitled to recover.

Directing our attention to the first proposition, that is, as to whether or not upon the disclosures of the evidence the conductor was justified in removing plaintiff's husband from the train, it is well to keep in mind the directions of the court embraced in the instruction as given for the plaintiff. This instruction was in these words:

"The court instructs the jury that if you believe from the evidence that the said William B. Powell at the time of his death was the husband of the plaintiff and that this suit was brought within six months after his death, and if you further believe from the evidence that on said date the said Powell boarded one of defendant's east-bound trains at the town of Pacific, Missouri, with the intention of becoming a passenger thereon, and that thereafter the said Powell, before said train had been stopped by said conductor, or before the employees of said defendant attempted to eject him, tendered the conductor in charge of said train either a ticket or money or both in sufficient amount to pay the lawful charge for his transportation on said train from said town of Pacific to the place of his destination, and which was a place where said train was to stop to allow passengers to leave said train, then it became the duty of the conductor to accept said money or ticket from said Powell, and defendant had no right to eject him from his train thereafter, and if you believe from the evidence that said Powell was so ejected and left in a place of danger by defendant on its right of way, and while endeavoring to extricate himself from said place of danger and in the exercise of ordinary care for his own safety was struck and killed by one of the defendant's engines and trains, then your verdict will be for the plaintiff on the first count of plaintiff's fourth amended petition."

The instruction for the defendant is the converse of the above given for plaintiff, and told the jury that if the plaintiff's husband refused either to produce a ticket entitling him to ride, or to pay his fare upon said train when requested so to do, then the conductor had the right to eject him, using such force as was necessary under all the circumstances, and if he did so, then plaintiff was not entitled to recover on account of said ejection of her husband.

Upon this proposition it will be observed that the instruction as herein indicated presented two issues. First, it submitted the issue as to whether or not Mr. Powell, plaintiff's husband, boarded defendant's eastbound train on the evening of the accident with the intention of becoming a passenger thereon. Second, if the jury should find that the relation of passenger and carrier existed, as applicable to plaintiff's husband, and that Mr. Powell boarded said train with the intention of becoming a passenger thereon, then the issue is presented to the jury as to whether or not said Powell, before said train had been stopped by said conductor and before the employees of the defendant railway company had attempted to eject him, tendered the conductor in charge of said train either a ticket or money or both in sufficient amount to pay the lawful charge for his transportation on said train from said town of Pacific to the place of his destination. Learned counsel for appellant complains of this instruction and earnestly insists that it does not fairly present the law as applicable to the subjects therein embraced. It is sufficient to say upon the proposition now under discussion that we have substantially indicated in the statement of this cause the nature and character of the testimony upon which the two issues herein referred to, that is, as to whether or not Mr. Powell, plaintiff's husband, boarded the train with the intention of becoming a passenger, and as to whether or not before the said train was stopped and before the employees

attempted to eject Mr. Powell he tendered his railroad fare to the place of his destination, and in our opinion there was sufficient evidence on the part of the plaintiff to authorize the submission of this issue to the jury.

In Holt v. Hannibal & St. Joseph Railroad Co., 174 Mo. 524, Division No. 2 of this court reviewed the authorities as applicable to the proposition now under discussion. The submission of the issues as hereinbefore indicated and the instruction of the court embracing those issues are fully supported by the case last cited. We deem it unnecessary to burden this opinion with a quotation of the discussion of the legal propositions in that case and the announcement of the principles applicable to them. It is sufficient to say, as herein stated, that it fully supports the conclusions of the trial court that there was sufficient testimony to authorize the submission of the issue to the jury.

## II.

The most serious proposition with which we are confronted, as disclosed by the record, is the action of the court in excluding the testimony as offered by the porter and train collector respecting the action and conduct of plaintiff's husband while being transported upon the train of the defendant from St. Louis to Pacific immediately prior to the occurrence of the accident which is involved in this proceeding.

We have embraced in the statement of this cause the evidence of the porter and the collector which was offered on the part of the defendant to show the conduct and actions of Mr. Powell, plaintiff's husband, in going from Union Station to Pacific on the evening that the accident occurred and immediately preceding such accident. There is no necessity for reproducing the evidence as offered, but it is sufficient to announce our conclusion as to the admissibility of such evidence. In our opinion the facts which the defendant offered to show by the porter and the collector upon the train,

as fully set forth in the statement of this cause, were clearly competent and should have been admitted upon the trial of this cause. The authorities not only in this State, but as well in other jurisdictions, all recognize the true definition of a passenger, that is, that "a passenger is one who enters the vehicle of a carrier with the intention of paying in money the usual fare for his transportation, or who is supplied with a ticket or pass, entitling him to ride to a given point."

One of the issues submitted to the jury by the instruction of the trial court was whether or not Mr. Powell, plaintiff's husband, boarded the train at Pacific just preceding the accident with the intention of becoming a passenger, or, in other words, with the intention of paying in money the usual fare for his transportation. Embraced in this offer was the fact that Mr. Powell was a constant traveler on the Frisco line to Springfield, Missouri, and other points beyond Springfield. This being true, presumptively at least, he knew the points at which trains would stop, and that this train did not make any stops until it reached Pacific, and he paid no fare at all to Pacific. He offered the conductor a commutation ticket to Eureka, but the train did not stop at that point, and he was carried, without paying any fare whatever, on account of a train closely following the train upon which he took passage; so closely, that the conductor would not undertake to stop the train in order to let Mr. Powell off. The train leaving Union Station upon which Mr. Powell took passage, left there at 8:21 p. m. It was 36 miles from Union Station to Pacific, and the testimony discloses that Powell boarded the other train from which he was removed at 9:30 p. m. Manifestly he could have only been at Pacific before boarding the train to return but a very short time. In fact, from the time he started from Union Station on the train at 8:21 and returning on the train from which he was removed, was practically one trip, and clearly his con-

duct and actions upon that trip and upon the first train he boarded at Union Station, for the purpose of throwing light upon his intentions when he boarded the train upon returning, were admissible in evidence and the trial court committed error in excluding it.

The testimony as offered shows that Mr. Powell first stated that he was going to Springfield, Missouri. There can be but one conclusion drawn from this statement that he was going to Springfield, Missouri: that is, that at least he was not acting in good faith with those in charge of the train, for had he frankly stated to the porter that he wanted to get off at Eureka he evidently knew that he would be met with the statement that that train did not stop at Eureka. But emphasizing the want of good faith in boarding the train as a passenger is the fact that he informed the collector after the train was running in going to Pacific, that he wanted to get off at Eureka. It was then that the collector informed him that the train did not stop at Eureka and he was carried to Pacific without paying any fare whatever. In a few minutes after reaching Pacific on that train he boards the train at 9:30 (the train from which he was removed by the conductor), and it seems from the disclosures of the record in this cause that when he got on a train that did stop at Eureka he didn't want to stop there, but wanted to come on back to Tower Grove. He tendered the conductor a commutation ticket from Eureka to Tower Grove, and the whole controversy between him and the conductor was as to the payment of his fare from Pacific to Eureka. It is quite significant that, if he in good faith wanted to go to Eureka and boarded the train at Union Station with that purpose in view, when he boarded the train at Pacific which stopped at Eureka, he should have presented the conductor with a commutation ticket from Eureka to Tower Grove and did not suggest to

the conductor that he wanted to get off at Eureka, and the whole controversy between Mr. Powell and the conductor was in respect to the payment of his fare between Pacific and Eureka, his commutation ticket being good from Eureka to Tower Grove; it at least seems a little bit singular that if he in good faith was wanting to go to Eureka, after being pressed for his fare, that he should present a commutation ticket from Eureka to Tower Grove, but didn't say to the conductor that he wanted to get off at Eureka.

The good faith of Mr. Powell in boarding the train of the defendant with the intention of becoming a passenger, was regarded by the trial court as a highly important issue in this cause, and the court submitted that issue to the jury by an appropriate instruction; therefore the actions and conduct of Mr. Powell in riding upon the trains of the defendant on that evening, which had any tendency to shed any light whatever upon his good faith in boarding said trains with the intention of becoming a passenger, were manifestly proper subjects for the consideration of the jury in reaching a correct conclusion upon the issue presented.

In Gates v. Railroad, 125 Mo. App. 336, testimony was offered by defendant and admitted that the plaintiff customarily tried to "beat" his way and had on several occasions severely taxed the patience of the conductors by refusing to pay his fare. Judge ELLISON, who wrote the opinion in that case, referred specially to that class of evidence which had been admitted, and condemned an instruction, in view of such evidence, which ignored the intentions and conduct of the plaintiff in boarding the train. That case also verly clearly pointed out the distinguishing features between the case of Holt v. Hannibal & St. Joseph Ry. Co., 174 Mo. 524, and the case then under consideration.

The rule is firmly established in the jurisprudence of this State, as well as in other jurisdictions, that when the question in issue is one involving intent, evi-

dence of other acts and conduct of a party of kindred character to the one under investigation, in order to illustrate or establish the intent or motive of the particular act directly in judgment before the court, has always been admissible, both in criminal as well as civil cases. [Davis v. Vories, 141 Mo. 234; Manheimer v. Harrington, 20 Mo. App. 297; Van Ravenswaay v. Insurance Co., 89 Mo. App. 73; Dodge v. Knapp, 112 Mo. App. 513.]

The trial court obviously had before it the good faith and intention with which Mr. Powell boarded the train and the court by an appropriate instruction, as before stated, submitted that issue to the jury, and as heretofore stated the evidence of the conduct and actions of Mr. Powell on the evening of this accident was clearly admissible upon the question of his intention of becoming a passenger at the time he boarded defendant's train. Emphasizing the correctness of the conclusion that this testimony as excluded was admissible, the plaintiff's counsel, in his cross-examination of the conductor on defendant's train, clearly recognized that testimony of that character was entirely competent. Learned counsel for respondent sought to introduce evidence supporting the theory that Mr. Powell, plaintiff's husband, boarded the train with the intention of becoming a passenger, that is, in the cross-examination of the conductor of defendant's train from which Mr. Powell was removed, counsel for plaintiff made the inquiry which was entirely new matter, as to whether or not Mr. Powell had not prior to this time been a passenger on defendant's trains and as to whether or not he had paid his fare. As heretofore indicated, this was entirely new matter and was evidence introduced on the part of the plaintiff, and doubtless for the purpose of showing that Mr. Powell had in fact entered the defendant's train with the intention of becoming a passenger. Plaintiff, by this

229 Sup—18

sort of a cross-examination, clearly opened the door for the admission of the testimony which was offered by the defendant and excluded by the court, and the respondent is not in position, having introduced testimony as to the prior conduct and actions of Mr. Powell in traveling upon the defendant's train, to seriously object to the introduction of testimony which shows his conduct and actions immediately preceding this accident.

The issue as to whether or not Mr. Powell, plaintiff's husband, entered the train of defendant with the intention of becoming a passenger was sharply in dispute before the jury, and the evidence upon that issue was conflicting, and as heretofore stated, the court presented that issue to the jury by an appropriate instruction; therefore, it follows that it was highly important that all of the facts which had any tendency to prove or disprove any of the issues presented in the case be admitted in evidence, and in our opinion this evidence as offered by the defendant as to the acts and conduct of Mr. Powell on the evening of the accident and just preceding the occurrence of the accident, which was excluded, was admissible, and the action of the court in excluding that testimony as offered constitues reversible error.

## III.

This leads us to the insistence of appellant that even though the removal of Mr. Powell from the train was wrongful, yet such removal was not the proximate cause of his death, and that plaintiff's husband, Mr. Powell, was guilty of such contributory negligence as to bar plaintiff's right of recovery.

The briefs of learned counsel both for plaintiff and the defendant, have collated about all the authorities applicable to the proposition stated and now under consideration. It is not out of place to say that all that can be said upon this proposition has been fully

stated not only in the oral argument but as well in the briefs of counsel representing the litigants in this case. We shall not undertake to review the cases cited by the respective counsel in this cause, but simply deem it entirely sufficient to state that the record as to the condition of the sides of the track from the point where Mr. Powell was removed from the train to the point where the accident occurred is very unsatisfactory, and we feel that as the case will necessarily be retried the testimony as to the conditions on each side of the track, embracing the points as heretofore indicated, can be made much more satisfactory, that is, we take it that the nature and character of the slope from the track down to the level of the barrow pits, as well as the testimony of other witnesses who say that there were safe places for Mr. Powell to walk on the sides of the track, can be more definitely and accurately explained than it appears in the present record in this cause; yet under the record as now before us we are unwilling to say that there was not sufficient testimony upon which to submit the issue to the jury as to the proximate cause of the injury which resulted in the death of Mr. Powell, as well as upon the question as to Mr. Powell's contributory negligence in walking back, from the point where he was removed, to the station at Pacific. Upon the record before us there are numerous authorities which support the action of the trial court in submitting the issue upon those questions to the jury. [Phillips v. Railroad, 211 Mo. 1. c. 442; Estes v. Railroad, 110 Mo. App. 725; Evans v. Railroad, 11 Mo. App. 463; Tilburg v. Railroad, 217 Pa. St. 618; Arnold v. Railroad, 115 Pa. St. 135; Malone v. Railroad, 152 Pa. St. 390; Railroad v. Rosenzweig, 113 Pa. St. 519.]

This sufficiently indicates our views upon the legal propositions as disclosed by the record now before us. We see no necessity for pursuing this subject further and it simply remains for us to announce our conclu-

sion that, for the error in excluding the testimony as offered by the defendant as to the conduct and actions of the plaintiff's husband as heretofore indicated, the judgment in this cause should be reversed and the cause remanded for a new trial, and it is so ordered. *Burgess, Lamm* and *Graves, JJ.,* concur; dissenting opinions filed by *Gantt* and *Valliant, JJ.,* in which *Woodson, J.,* concurs.

## DISSENTING OPINION.

GANTT, J.—I am unable to concur in the opinion of my learned brethren. The only error, as I understand the opinion of the majority, for which the judgment is reversed, is that the circuit court erred in excluding the offer of defendant to prove that Mr. Powell, when he boarded the train which took him from St. Louis to Pacific—on the evening that he took the defendant's train at Pacific to return to St. Louis—at the demand of the porter of the train to know his destination, answered, "Springfield;" that when the conductor of that train requested his fare, Mr. Powell tendered him a commutation ticket from St. Louis to Eureka, stating that he wanted to get off at Eureka, an intermediate station between St. Louis and Pacific; that the conductor told Powell that train did not stop at Eureka and he could not carry him to Eureka; that Powell refused to pay other fare, and that the conductor of that train did not stop his train and put him off, because of the proximity of another train which would follow twenty minutes later on the same track, but did put him off at Pacific. In my opinion the circuit court correctly held that what occurred on that train was not material to the determination of the right of defendant to expel Powell from the train from which he was expelled; that the relative rights of defendant and Powell were to be determined by the jury and the court from the facts developed after

Powell took his seat in defendant's train from which he was expelled. He might have been in the wrong as to his demand to be put off at Eureka and entirely in the right as to his demand to be carried to St. Louis upon the tender he made to the conductor on that train, and the testimony offered did not tend to prove he was wrong and did not justify his expulsion from the train from which he was put off, and the evidence shows that the conductor was not acting upon the previous conduct of Powell on the train on which he came to Pacific, but was governed entirely by what he considered was his right from what occurred on his own train alone. Powell's right to be carried depended upon what he did on that train, the offer of fare and the refusal of the conductor to accept his fare. That was a controverted question and was properly submitted to the jury, and in my opinion the exclusion of that evidence was correct.

The justification of the ejectment of plaintiff's husband from defendant's train by its conductor and train crew is based upon the defendant's contention that her husband refused to pay his fare. On this point there was testimony in support of the plaintiff's assertion that her husband gave the conductor a ticket from Eureka to Tower Grove, and also tendered him the difference in cash to cover the trip from Pacific to Eureka and that the conductor accepted the ticket and turned it in with his report, and on the other hand the conductor denied that Powell tendered him the money to pay his fare from Pacific to Eureka. The court submitted this question to the jury in two instructions. The instruction for the plaintiff is in these words:

"The court instructs the jury that if you believe from the evidence that the said William B. Powell at the time of his death was the husband of the plaintiff and that this suit was brought within six months after his death and if you further·believe from the evidence

that on the said date the said Powell boarded one of the defendant's east-bound trains at the town of Pacific, Missouri, with the intention of becoming a passenger thereon, and that thereafter the said Powell, before said train had been stopped by said conductor, or before the employees of said defendant attempted to eject him, tendered the conductor in charge of said train either a ticket or money or both in sufficient amount to pay the lawful charge for his transportation on said train from said town of Pacific to the place of his destination, and which was a place where said train was to stop to allow passengers to leave said train, then it became the duty of the conductor to accept said money or ticket from said Powell, and defendant had no right to eject him from his train thereafter, and if you believe from the evidence that said Powell was so ejected and left in a place of danger by defendant on its right of way, and while endeavoring to extricate himself from said place of danger and in the exercise of ordinary care for his own safety was struck and killed by one of the defendant's engines and trains, then your verdict will be for the plaintiff on the first count of plaintiff's fourth amended petition.''

The instruction for the defendant is the converse of the above given for plaintiff, and told the jury that if the plaintiff's husband refused either to produce a ticket entitling him to ride, or to pay his fare upon said train when requested so to do, then the conductor had the right to eject him, using such force as was necessary under all the circumstances, and if he did so, then plaintiff was not entitled to recover on account of said ejection of her husband. We take it that counsel for defendant do not seriously insist that there was not sufficient evidence to require the jury to determine whether the deceased, Powell, did or did not tender sufficient money in addition to his ticket from Eureka to Tower Grove to pay his fare. The conductor states that he accepted and turned in the ticket from Eureka

to Tower Grove, and told Powell he would carry him to Tower Grove if he would pay the fare, twenty-eight cents, from Pacific to Eureka. Of the only passengers in the car who witnessed the taking of the ticket by the conductor from Powell, one testified that while Powell was sitting in his seat, he pulled out a half dollar and handed it to the conductor and told him to take out the fare, and the other says that, while sitting in his seat, Powell reached in his pocket and got a piece of money and said, "Don't put me off, I will pay you; here is your money." The conductor said he heard the money fall on the platform while they were putting Powell off of the train. Obviously under this testimony the jury were warranted in finding that Powell entered the train and took a seat with intent to become a passenger; that he gave the conductor a ticket for a part of the journey and tendered the cash for the remainder of the trip. Was his expulsion then lawful?

In Holt v. Hannibal & St. Joseph R. R., 174 Mo. 524, the facts appeared to be that Holt got on the train without a ticket and told the conductor he had none, but wanted to be protected in paying his fare by getting a "credit slip" for the amount thereof, to be used as a basis for a rebate on his mileage contract. The conductor demanded the fare and Holt asked for the slip. After a dispute the conductor pulled the bell cord to stop the train, and it began to slow up. Holt then said, "Although it is unfair and unjust, rather than be put off the train this time of night, I will pay my fare." The conductor then signaled the train to go ahead by pulling the bell cord. After the conductor did this, Holt requested the conductor to go through the train and then come back to see him. Thereupon the conductor seized Holt and pushed him out into the vestibule of the train and again pulled the cord to stop the train. Holt then said: "Take this fare and don't put me off this time of night."

The conductor, however, put him off. Upon this state of the facts, this court through Fox, J., after quoting section 1074, Revised Statutes 1899, said: "It will be seen from the terms of the foregoing statute that a passenger can only be put off of the train for reasons therein specified, and in the manner therein prescribed, when it shall have been brought to a stop at one of its stations, or near any dwelling house. With reference to these provisions, our statute is a literal copy of the one in force in the State of Wisconsin, and it has been uniformly held in that State that such a statute, by a necessary implication, prohibits the forcible ejection of a passenger for refusal to pay his fare, except at the places and in conformity with the other conditions specified in the statute. [Boehm v. Railroad, 65 N. W. 506.] And such is the uniform doctrine in other States having similar statutes. [Railroad v. Latimer, 128 Ill. 171; Railroad v. Branch, 45 Ark. 524; Stephen v. Smith, 29 Vt. 160.] A passenger is one who enters the vehicle of a carrier with the intention of paying, in money, the usual fare for his transportation, or who is supplied with a ticket or pass entitling him to ride to a given point. After his relation as such is established, the next inquiry in the construction of the statute is, what is meant by the term 'shall refuse to pay his fare,' upon which depends the lawfulness of his expulsion from the train? This particular delinquency, unlike the other instances of misconduct mentioned in the statute, concerns the carrier alone, and is of no interest to fellow-travelers. It authorizes a removal of the passenger upon the just principle that he who refuses to pay shall be refused a ride." After discussing whether or not a passenger, after refusing to pay his fare, may regain his rights to tender the fare, after steps have been taken for his removal, the court proceeds to say: "The mere offer to pay fare might be followed by subsequent refusals of actual payment *ad infinitum*; and if that alone were sufficient grounds

for the cessation of the ejection of a non-paying passenger, the railroad companies might find it out of their power to adhere to any schedule as to time in the running of their trains. No such consequence, however, could ensue if, after a first refusal, the carrier was only required to cease the ejectment of a non-paying passenger upon the actual tender of the fare; for, by receiving the money, thus tendered, the company would at once get its own and escape even the delay attending a complete expulsion of a passenger, and necessarily avoid any future repetitions of the delay in running its trains incident to controversies over fare with a passenger of a vacillating mind. . . . A passenger is entitled to a reasonable indulgence in the discussion of his rights and duties in the payment of fare when it is demanded by the agent of the company.'' After reciting the facts above detailed the court said: ''The subsequent actual tender of the money for his fare by plaintiff, if made before or during the process of his expulsion by the conductor, should have been accepted, and he should have been allowed to remain upon the train. We think, therefore, that the following instruction, requested by plaintiff, should have been given: 'Although the jury should find that plaintiff did, at first, refuse to pay his fare, yet if, when he saw the conductor was stopping the train to put him off, he then changed his mind and offered to pay and tendered to the conductor the money for his fare, it became the duty of the conductor to accept it; and if you so find that plaintiff did thus offer to pay, your verdict must be for the plaintiff.' ''

Learned counsel for the defendant requested an instruction announcing a contrary rule to the one just quoted from our opinion in Holt v. Railroad, and in their brief cite decisions from Iowa, Massachusetts, and New Jersey. With all due respect to those courts, we see no reason for departing from the principles announced in Holt v. Railroad, and, consequently, as

the question of the actual tender of the fare was presented to the jury by an instruction in accordance with that case, it must be, for the purposes of this appeal, considered that plaintiff's husband actually tendered the conductor the necessary money in addition to the ticket which he delivered to him before he was removed from the car, and this being true, it must be held that as to the question of his removal for failure to pay his fare, the ejectment was unlawful.

As already said, section 1074 provides that even if a passenger refuses to pay his fare, yet the servants of the company are only authorized to eject him from the train "at any usual stopping place or near a dwelling house." The evidence is practically uncontradicted that there was no dwelling house near the place where the plaintiff's husband was ejected from the train, and it was at least a half mile from the station at Pacific. It was a dark night and about 9:30 o'clock, and there was no light of any kind or character at that place. The conductor testified that he had orders to meet the west-bound train at Allerton, which was four miles east of Pacific, and it would have taken only seven or eight minutes for his train to go to Allerton from the place where he stopped to put Powell off. That the expulsion of plaintiff's husband at this place and under these circumstances was wholly unwarranted by the statute, we think is too clear for discussion. It has been universally ruled by the courts of this country, in those States which regulate the manner in which passengers may be put off of the train for failure to pay their fare, that an expulsion at any other place than those mentioned in the statute is unlawful. [Phettiplace v. Railroad, 84 Wis. 412; Stephen v. Smith, 29 Vt. 160; Railroad v. Peacock, 48 Ill. 253; Railroad v. Latimer, 128 Ill. 163; Maples v. Railroad, 38 Conn. 557; Baldwin v. Railroad, 64 N. H. 596.]

But it is insisted by the defendant that even though the expulsion of Powell from the train was unjustified,

nevertheless it was not the proximate cause of his death, and that the instruction already set forth was unsupported by the testimony in that Powell was not at the time he was killed endeavoring to extricate himself from a place of danger. It is insisted by the defendant that Powell could easily have walked up the right of way without at any time going upon the railroad track itself, and he was not warranted in using the track as a footpath. This in our opinion is the important proposition in this case.

In Miller v. I. M. Ry. Co., 90 Mo. 389, this court said: "It is sufficient if the injury is the natural, though not the necessary or inevitable, result of the negligent fault. In Kellogg v. Railroad, 26 Wis. 223, it was ruled in a very able opinion by Dixon, C. J., that the maxim, *causa proxima,* etc., includes not only liability for all natural and probable injuries having origin in the wrongful act or omission, but such injuries as are likely in ordinary circumstances, to ensue from the act or omission in question. And it has been ruled in England that it is not necessary to a defendant's liability, after you have established his negligence, to show, in addition thereto, that the consequences of the negligence could have been foreseen by him." In Phillips v. Railroad, 211 Mo. l. c. 442, in discussing this question, of what is the proximate cause, Graves, J., said: "We are not saying that the act of placing his practically undressed body across a street railway track was the result of his insane condition, but there are sufficient circumstances to authorize the submission of the question, under properly guarded instructions, to a jury for its decision. It cannot be said that such an act was not one that could not have been reasonably anticipated by defendant's surgeon when he placed an insane man aboard of a train, unattended and without notice to his family, knowing that he would have to find his home in a populous city, filled with a network of street railway lines. The rule is

properly stated by Thompson in his work on the Law of Negligence, sec. 59, thus: ' "It is not necessary," say the Supreme Court of Minnesota, following the Supreme Judical Court of Massachusetts, "that the injury, in the precise form in which it in fact resulted, should have been foreseen. It is enough that it now appears to have been a natural and probable consequence." In other words, it is not necessary to a defendant's liability, after his negligence has been established, to show, in addition thereto, that the consequences of his negligence could have been foreseen by him; it is sufficient that the injuries are the natural, though not the necessary and inevitable, result of the negligent fault—such injuries as are likely, in ordinary circumstances, to ensue from the act or omission in question.' "

In Estes v. Missouri Pacific Ry. Co., 110 Mo. App. 725, the plaintiff sought to recover damages on account of injury of a passenger as the result of a collision, and one of the elements of damage was the result of poison ivy with which she came in contact after she had gone out of the wrecked car and had gone to the shade on the side of the railroad. The defendant urged that this was not the proximate result of the collision, as there was no necessity for her to leave the car. Notwithstanding it was shown that the car in which she was a passenger was not badly injured and was a suitable place for her to remain, yet it was held that the circumstances justified her in leaving it. Some one stated in her hearing that another train was approaching in the rear, and that there was likely to be another collision, and with a view of anticipating further danger she left the car, and became, as stated, poisoned on her ankle. The plaintiff having just escaped, but not without injury, from an appalling disaster, the law does not require of her such precaution, but on the contrary makes allowance for the naturally disturbed

mental condition, and the instinct to flee from such danger, whether the danger was well founded or not. She ought not to be precluded from recovery for the injuries she sustained as a consequence, and the court said, "We have been cited to no authority directly in point, and if there be none the principle is sound and this case will afford the precedent."

But a case still more apposite is that of Evans v. Iron Mt. R. R. Co., 11 Mo. App. 463, which was a suit brought against the railway company by a passenger who had a ticket from St. Louis to Little Rock, Arkansas, which expired at midnight on the day on which the passenger boarded the train at St. Louis at nine o'clock p. m. When the train got out of St. Louis, the conductor accepted the ticket and told the plaintiff it would not be good after midnight, and he could not ride beyond Bismark without additional fare. The plaintiff endeavored to induce the conductor to carry him through to Little Rock, but failed to do so, and he was put off at a station between midnight and two o'clock in the morning. The plaintiff followed the railroad track, and while so doing fell through a cattle-guard and injured his knee. The court said: "The next question is whether the court erred in permitting the plaintiff to prove that, after being put off the train, and while walking along the track towards the next station, he received an injury by falling through a cattle-guard. Was this such an injury as might reasonably be expected to flow from the act of putting the plaintiff off the train at the time and place, and under the circumstances shown by his testimony? Was this danger a proximate or remote consequence of the wrong of putting him off the train? Taking the plaintiff's testimony as the basis of this inquiry, as we are entitled to do after a verdict in his favor, we must remember that it was a very dark night and a rainy night in the winter; that the station was a flag station merely; that the plaintiff was totally unacquainted

with the country; that the only man he was able to speak to refused to take him to his house, but told him he could get shelter at Arcadia, a mile and a half distant; that he took the most direct and safe way of getting there—the railroad track; and while so endeavoring to get there, fell through the cattle-guard and was injured. A traveler put off at such a place and at such a time would be most likely to do what the plaintiff did do; and it is not, we think, straining any legal principle to hold that the hurt which he received was the proximate consequence of the wrong of putting him off of the train under the circumstances." In support of this conclusion, the Court of Appeals in that case cited Patten v. Railroad, 32 Wis. 524.

In Winkler v. Iron Mt. Ry. Co., 21 Mo. App. 99, it appears that a passenger was discharged at a place other than indicated as the destination of his ticket, in the nighttime, and while following along the railroad track, fell and was injured, and the court said: "If a railway carrier, instead of discharging his passenger at the place of destination called for by the contract of carriage, lands him at another place from which he cannot reach the place of destination by any practicable route without encountering serious danger, and the passenger, immediately thereafter proceeding by the only practicable route to the place of destination, without fault or negligence on his part, encounters such danger, and is hurt, we have no difficulty in saying that the hurt is the proximate consequence of the wrong done by the carrier. A prudent carrier would foresee such danger to the passenger, and should, we think, be held bound to foresee it, and to answer the consequences of it."

Applying the doctrine of the foregoing cases to the conceded facts of this case and we have a passenger put off at 9:30 p. m., on a dark night with no station nearer than Pacific, a half mile west, and no lights to aid him in finding his way out of his dilemma, no

dwelling house near, and left on an embankment between eight and nine feet high on either side of which there was a ditch or excavation, and the right of way fence on the south was near the Meramec river. On the north and beyond the ditch on that side were the tracks of the Missouri Pacific Railway, which were parallel with the defendant's railroad at this point. The plaintiff's husband was entirely uninformed as to his surroundings. Knowing that he had only a few moments before left the station at Pacific, what more natural than that he should turn in that direction to seek a way out of the danger in which he had been placed? In the absence of all the evidence to the contrary, the presumption is that he exercised ordinary care in endeavoring to extricate himself from this dangerous place. Under such circumstances, it was a question for the jury whether his death was not the proximate consequence of a wrong inflicted upon him by unlawfully excluding and expelling him from the train at that hour of the night and at that place. And it cannot be said as a matter of law that his death was an unnatural, improbable and remote consequence of the act of unlawfully ejecting him at such an hour and at such a place. And we think that the second instruction for the plaintiff on this point was in compliance with the well settled law of this State, and there was no error in giving it.

This brings us to the further contention of the defendant that plaintiff's husband was guilty of such contributory negligence as a matter of law in walking upon said tracks, as would debar plaintiff's right of action. As to whether W. B. Powell was guilty of contributory negligence or whether he exercised ordinary care after he had been left in this place of danger by the defendant, was a question for the jury, which was correctly submitted to them in the instructions both for the plaintiff and for the defendant. As to the facts on this part of the case, it appears that

the place where Powell was killed is indicated on the plat by the cross mark "Accident." It is about one-fourth of a mile from the place where the deceased was expelled from the train. There was no evidence that there was any light at this place and the plat shows that from the place of ejection to the place of the accident, there was a deep barrow pit on the south side of the railroad track all the way; that on the north of the railroad track there was a ditch for a great portion of the way and the balance of the way was a net work of tracks to the north of the main line of the Frisco where Powell was killed. At the point of the accident there was a ditch between five or six feet deep on the south side of the track immediately north of it and at a distance about the same as between the rails of the main track. There was a switch leading from the main track on the Frisco northeast to the transfer track between the Frisco and the Missouri Pacific, and immediately north of this Frisco switch was a switch leading from the main track of the Missouri Pacific southeast to this same transfer track, and immediately north of the Missouri Pacific switch was the main track on the Missouri Pacific, and north of that there were two side tracks, so that in that immediate vicinity and to the north of where deceased was walking there were five other railroad tracks beside the one on which Powell was walking, with the intervening space of about four feet and seven inches; in addition to this there was an engine on the main track of the Missouri Pacific about twenty-five feet from where Powell was walking, which engine was making a noise with its bell, whistle and steam exhaust. The testimony of the engineer of the engine which struck and killed Powell, was to the effect that his engine came around the curve and was within seventy-five feet to one hundred and twenty-five feet of Powell before he saw him, and this engine was running at a rate of thirty-five miles an hour. It struck and killed Powell in less than four sec-

onds after he came within the view of the engineer. All
or nearly all of the witnesses, who saw this accident,
testified that Powell's attention was riveted upon the
Missouri Pacific engine, and it was natural that it
should have been, because it was very near to him, in-
deed much nearer than the Frisco engine when its whis-
tle was sounded. He was in a strange place, close to the
Missouri Pacific engine, which was making a great
noise, and naturally he was seeking to avoid danger
from that source. If he had gone north at that moment
he would have had to cross the track upon which the
Missouri Pacific engine was then moving, and if he had
gone south he would have had to climb down an em-
bankment five or six feet. Having just been put off of
the train going east, he would not naturally look for a
train from that direction so soon. Now under circum-
stances like these, the question of whether a person
left in such a place of danger has been guilty of con-
tributory negligence has often been before the courts.

In Tilburg v. The N. C. R. R. Co., 217 Pa. St. 618,
it appears that the plaintiff was wrongfully ejected
from the train at night some distance from the station-
house or other place of shelter and started to the
nearest station walking upon the railroad track; he
was not seen from that time until his body was found
the next morning about one-fourth of a mile from the
place where he was put off, and the evidence tended
to show that he was killed by a locomotive. The cir-
cuit court granted a nonsuit, but the Supreme Court
of Pennsylvania on appeal said: "We cannot agree
with the learned trial judge in the disposition he made
of this case. . . . The conductor exercised his au-
thority and . . . forcibly ejected Tilburg from the
train, at a time and place and under circumstances
which a jury would have been fully justified in finding
endangered the life of the passenger. 'In the case in
hand' (quoting from the case of Arnold v. Railroad, 115

229 Sup—19

Pa. St. 135), 'the duty of the conductor, in expelling the plaintiff from the cars at the time and place selected for that purpose, was certainly one that was not strictly defined. It may be admitted that as a faithful officer he was obliged to eject Arnold from the train, but then the very important question arises, did he, as the company's employee, properly discharge his obligation in dismissing the plaintiff from the cars between the tracks of the railroad, on a very dark night, at a way station that, from the want of light in or about it, could not be seen?' . . . After Tilburg had been expelled from the train he was required to use reasonable and ordinary prudence in seeking shelter and in attempting to return to Cogan Valley. Under the circumstances, it was not negligence *per se* for him to walk on the railroad in going from Haleeka to Cogan Valley. . . . What avenue or avenues of escape were presented to Tilburg that night, and whether he exercised prudence and care in selecting the railroad as the way of reaching his destination, after his ejection from the train, were questions for the jury. . . . Would a reasonably prudent man, under the circumstances, have started out in the darkness and the storm to hunt roads or paths unknown to him, and which might have existed, and thus have subjected himself to the dangers of the holes and pitfalls which might have been open to receive him; or would he have taken the direct route, which lay along the defendant's tracks, to travel the mile required to reach his destination? Again we may be permitted to quote as pertinent in this connection what was said in the Ham case, 155 Pa. St. 555: 'Whether a safe road was there or not, was only a part of the question. There still remained whether Ham, with ordinary diligence and prudence, could have seen it, and seeing, ought to have taken it. A man familiar with the locality may take an uninviting path, knowing it will lead him aright, while a careful man not knowing how it may turn out, nor even whither it may

lead, may well be exonerated from negligence in not making the experiment, though it would in fact have been the best thing to do. The elements of prudent conduct on the part of Ham were too many and too varied to be determined except by the jury, and the rule laid down for the jury's guidance was in accordance with the settled law.' ''

The court in this case quoted also from the case of Malone v. Pittsburg and Lake Erie Railroad, 152 Pa. St. 390, where an action for personal injuries was brought by a woman who was wrongfully ejected from the train upon which she was a passenger, at a regular stopping place, where there was no station house, but only a box car used temporarily as a station. A storm was prevailing at the time she was ejected. She started to walk back to the station from which she had started, and was injured. The court said: ''We start with the fact established by the verdict that plaintiff was wrongfully put off of the train, at a regular station to be sure, but one where she was a stranger, and where there was at the time no regular station house. She, in no fault herself, and being thus put in a position of embarrassment and difficulty, was not bound to use the best judgment, but only good faith and reasonable prudence.'' Continuing further in the Tilburg case, the court said: ''Whether the servants of the carrier company were guilty of negligence in carrying Tilburg beyond Cogan Valley Station, or in putting him off at Haleeka Station, which, in either case, proximately resulted in his death, and whether he exercised the care required of him after he had alighted at Haleeka Station, are questions which should, under proper instructions, have been submitted to the jury.''

In the case of Lake Shore & Michigan S. Ry. Co. v. Rosenzweig, 113 Pa. St. 519, the plaintiff was put off of the train by the conductor because he did not have the proper ticket, although he had been told by an em-

ployee of the railroad to take the car in which he seated himself. The court held that a passenger's right to recover damages for injuries received from the negligence of the conductor in putting him off at a dangerous and improper place, does not depend upon his right, under his contract with the company, to ride upon that train, but upon the fact that his injuries were the natural and probable consequences of the negligent act of the conductor, and the court said: "Was the place dangerous, not alone because of the railroad tracks and switches, but of their use by trains, cars, locomotives, and for the making up of trains? These were the conditions present which made the place dangerous, and especially dangerous for a stranger in the night-time. While plaintiff was trying to get out of that place he received the injury. . . . It is probable that the jury inferred that one of the things which made the place dangerous, struck him. There is where the defendant put him, and where he was hurt. The cause and effect were closely connected, and by prudent circumspection and ordinary thoughtfulness the conductor could have foreseen that the plaintiff's injury was likely to happen." In this case the plaintiff was put off in the dark, in railroad yards, one-half mile from the depot.

Many other cases to the same effect are cited in the briefs of counsel. Summed up in a word they announce the doctrine that when a passenger is put off in a place of danger without fault of his own, he is bound to use great prudence and judgment to get out at the first opportunity, but in so doing he is not chargeable with responsibility for the result, and the standard of care on his part to use is that of an ordinarily prudent and careful man. Measured by this rule, we think it was a question of fact for the jury to say whether Powell used ordinary care in endeavoring to extricate himself from the dangerous place in which he had been placed by the wrongful act of the

defendant's conductor.  He was a stranger in the place, it was a dark night, and it cannot be said that it was unnatural, with a ditch on both sides of the track, for him to follow the railroad track towards the only place of safety of which he had any knowledge, the station at Pacific.  It was at least three and one-half miles to the closest station on the east and if he had crossed the ditch and gone south he would have found himself on the banks of the Meramec river, and if he had gone north he would have found himself on the tracks of the Missouri Pacific Railroad Company.  But we think as was said in Tilburg's case, it was not negligence *per se* for him to walk on the railroad track back to the station at Pacific.  It was for the jury, we think, to take into consideration that no less than fifteen minutes from the time of his ejectment from the train, Powell was killed; indulging the presumption that he was exercising ordinary care for his own safety, it was for the jury to measure all the surrounding circumstances or dangers that beset him on the different sides and for them to say whether, having been placed in this dangerous dilemma, he acted otherwise than as a prudent and ordinarily careful man would have done.  It does appear that he was moving towards the first open street when he was struck and killed, there was no street or road leading from the railroad track where he had been left by the defendant's conductor, and Elm street in Pacific.  The circuit court submitted the question to the jury, first, as to whether Powell boarded the train with the intention of becoming a passenger thereon, and whether he tendered the conductor money for his fare, and whether he was left in a place of danger when he was evicted from the train, and whether he was in the exercise of ordinary care in endeavoring to extricate himself from his dangerous position after he was left on the track of the defendant.  We think under the best considered adjudications of this country these were questions that

the plaintiff was entitled to have determined by the jury. And the jury having found in her favor, she is entitled to an affirmance of this judgment, unless the defendant is right that the evidence establishes such contributory negligence on the part of the plaintiff's husband as would debar her from recovery. This, we think, cannot be maintained. The various cases cited by the learned counsel for the defendant, in which the injured party or his legal representative has been debarred a recovery on account of his voluntarily and knowingly putting himself in the place of danger and failing to exercise his faculties of looking and listening, have little bearing upon the peculiar facts of this case. Here Powell, the deceased, resisted the employees of the defendant before ejecting him from the train and he was put upon its track and right of way against his will, after he had offered to pay all that they required to entitle him to ride to St. Louis. He was left in this dangerous situation in the nighttime, in the dark, and he was utterly unfamiliar with his surroundings, and the fact that he walked upon the railroad track in endeavoring to remove himself from his dangerous position was not negligence *per se*. Having been placed in this dangerous place by the misconduct of defendant's servants, it does not lie in the mouth of the defendant to charge him with having been guilty of contributory negligence in being in this dangerous place.

As already indicated, we think it was clearly a question for the jury in the circumstances of the case to say whether he was guilty of contributory negligence or not, and we are clearly of the opinion that it cannot be said as a matter of law that he was guilty of such contributory negligence that plaintiff was not entitled to go to the jury on that point.

In my opinion the case was well tried and the instructions carefully drawn and the verdict is support-

ed by the testimony, and the judgment should be affirmed. *Valliant* and *Woodson, JJ.,* concur in my views.

## DISSENTING OPINION.

VALLIANT, J.—The term "passenger" in its ordinary meaning implies a person who enters a car or other carriage of a common carrier with the intention of being carried and of paying his fare, either by ticket or with money, and if the term "passenger" as used in section 1074, Revised Statutes 1899, is used in that sense, then the testimony offered by the defendant in this case, tending to show that Powell entered the car without intending to pay his fare, should have been received. But the word passenger as used in that section does not, in my opinion, necessarily mean a person entering a car with the intention of paying his fare. The statute was designed to prohibit inhuman treatment in the expulsion of a person from a train. Our Constitution declares that cruel and unusual punishment shall not be inflicted even on a criminal. The common law declares that you may expel a trespasser who comes into your house, but in so doing you shall use no more force or inflict no more injury on him than is necessary to expel him. A railroad company has the right to put a man off its train who intrudes himself into a car and refuses to pay his fare, but this statute is aimed to forbid inhuman treatment in doing so. It is against the law to kill or imperil the life of even a bad man. If a railroad company puts a man off its train in the night, between stations, far from any habitation, in the cold or rain, he is liable to suffer and maybe die. It is to forbid such treatment of the trespasser on the train, whether he be a good man or a bad man, deserving or undeserving, an unfortunate or a dead beat, that the statute is designed. The best evidence that a man has entered a car with the intention of not paying his fare is the fact that when the

conductor calls for his fare he refuses to pay it. The language of the statute is: "If any passenger shall refuse to pay his fare, or shall behave in an offensive manner," etc., he may be put off the train, "using no unnecessary force and at any usual stopping place or near any dwelling house," etc. The word passenger is in this statute used in reference to a person in the car who refuses to pay his fare and necessarily implies a person who entered the car without intending to pay. The word passenger is not there used to mean a person clothed with all the rights and privileges of a passenger, but it is used in a restricted sense and means a person who has entered the car or is in the car for the purpose of being carried.

There is a decision of this court to the contrary of the views hereinabove expressed, Lillis v. St. L. &c. Ry., 64 Mo. 464, but in my opinion the court in that case failed to observe the spirit and purpose of the statute. For these reasons I dissent from the majority opinion in this case. *Gantt* and *Woodson, JJ.,* concur in these views.